**GENERAL MOTORS CORPORATION,**
Plaintiff-Appellee,

v.

**CAPITOL CHEVROLET COMPANY, et al., Defendants-Appellants.**

Supreme Court of Tennessee.

Jan. 17, 1983.

Aubrey Harwell, Jr., Jon D. Ross, Nashville, for plaintiff-appellee; Otis M. Smith, James C. Cubbin, Detroit, Mich., of counsel.

Cecil D. Branstetter, Carrol D. Kilgore, Nashville, for Capitol Chevrolet Co.

John C. Tune, Carter Andrews, Nashville, for E.B. Smith Chevrolet.

Kate Eyler, William O. Kelly, Asst. Attys. Gen., for State of Tenn.; William M. Leech, Jr., Atty. Gen. and Reporter, Nashville, of counsel.

## OPINION

HARBISON, Justice.

This action began as an administrative proceeding before the Tennessee Motor Vehicle Commission. Plaintiff General Motors Corporation, through its Chevrolet Motor Division, applied for permission to open a new dealership in the southeastern portion of Davidson County, a part of the metropolitan Nashville trade area. There were four existing Chevrolet dealerships in Davidson County and a number of others in surrounding counties. Several of the existing dealers protested on the ground that a new dealership was not in the public interest and was not justified. After a lengthy contested hearing the Commission unanimously denied the application. General Motors appealed to the Chancery Court seeking review under the Uniform Administrative Procedures Act, T.C.A. § 4–5–117.

On appeal the Chancellor did not rule upon the merits of the decision reached by the Commission. Instead he held unconstitutional the statute under which the proceeding was brought and also held that the Commission was so constituted that it did not provide a fair and impartial tribunal and that the statutes creating it violated a state constitutional prohibition against the granting of monopolies. He did hold that the statutes did not violate the interstate commerce provisions of the United States Constitution.

We reverse except as to the latter issue, with respect to which we affirm.

The questions presented in this case were previously addressed and decided contrary to the present contentions of General Motors in the case of *Ford Motor Co. v. Pace,* 206 Tenn. 559, 335 S.W.2d 360 (1960). There another automobile manufacturer made a wide-ranging constitutional attack upon the original statutes creating the Tennessee Motor Vehicle Commission. The statutes were upheld, and the Supreme Court of the United States declined review. *See* 364 U.S. 444, 81 S.Ct. 235, 5 L.Ed.2d 192 (1960), *rehearing denied,* 364 U.S. 939, 81 S.Ct. 377, 5 L.Ed.2d 371 (1961).

The Chancellor resolved the present issues contrary to the *Pace* decision, *supra,* upon the ground that a 1977 amendment to the previous statutes materially varied the duties of the Commission and rendered *Pace* inapplicable. He also deemed decisions of the United States Supreme Court subsequent to 1960 to require a different result. We disagree and adhere to the opinion in *Pace, supra.* The only authority contrary to *Pace* which has been cited to us is a split decision of an intermediate California appellate court, *American Motors Sales Corp. v. New Motor Vehicle Board,* 69 Cal. App.3d 983, 138 Cal.Rptr. 594 (1977), which is not binding here.

The Tennessee Motor Vehicle Commission was created twenty-seven years ago. *See* 1955 Tenn.Pub.Acts, ch. 79. The original statutes were broad and sweeping. They provided for the licensure of all persons involved in the manufacture, distribution and sale of motor vehicles. The preamble to the act, now T.C.A. § 55–17–101, states:

"The legislature finds and declares that the distribution and sale of motor vehicles in the state of Tennessee vitally affects the general economy of the state and the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license motor vehicle manufacturers, distributors, dealers, salesmen, and their representatives doing business in Tennessee in order to prevent frauds, impositions and other abuses upon its citizens."

The statute provided for the licensing of automobile manufacturers, distributors, dealers and salesmen and is very comprehensive in its terms. To enforce its provisions a nine-member Commission was created with many duties, including the licensing of the various categories of personnel mentioned above, prohibition of improper and unfair sales practices by each of them, revocation of licenses, holding of hearings, and the like. All facets of the statute were attacked by the Ford Motor Company in the *Pace* case, *supra,* including almost every issue now raised by General Motors Corporation. Although the Chancellor held the statute unconstitutional, this Court reversed and unanimously sustained it in all respects.

A comprehensive amendment to the previous statutes was enacted as 1977 Tenn. Pub.Acts, ch. 162. This chapter changed somewhat the composition of the Commission, adding two independent consumer members and bringing total membership from nine to eleven. It broadened the powers of the Commission in several respects, prohibiting an additional number of potential improper or unfair practices on the part of manufacturers against dealers, including the exertion of undue pressure upon dealers regarding the financing and the legal structure of their operations. It further prohibited direct competition by a manufacturer with a franchised dealer, discrimination among franchisees and the granting of additional competitive franchises in a market area previously franchised to existing dealers.

It is the insistence of General Motors that prior to 1977 the statute did not involve the Commission in the adjudication of disputes between dealers and manufacturers. This is inaccurate. From their inception the Tennessee statutes have given the Commission jurisdiction to revoke the licenses of manufacturers who dealt unfairly with dealers, including failing to make timely delivery of vehicles, inducing dealers to enter into improper agreements by threats to cancel franchises, forcing unneeded or unwanted merchandise upon dealers as a condition to renewing franchises, improperly terminating franchises, forcing dealers to accept deliveries by specific means of transportation, and entering into franchise agreements with dealers not equipped to provide consumers with services warranted by the manufacturers. *See* 1955 Tenn.Pub. Acts, ch. 79, § 5(h); T.C.A. § 55–17–114(c).

Admittedly there are some differences between terminating existing franchises and the creation of additional ones, but both may involve serious manufacturer-dealer disputes. As stated earlier, the previous statutes which were sustained in *Pace* gave the Commission authority to resolve disputes concerning the termination of franchises, although they did not deal with the related question of the creation of additional or competitive dealerships. Insofar as the pecuniary or selfish interests of dealer-members of the Commission are concerned, however, the two types of controversies present considerations of a similar character. This Court sustained the validity of the original Commission in *Pace* although its membership at that time was composed entirely of franchised dealers and rejected the argument by Ford Motor Company that a commission so constituted was unfair, biased and had a substantial pecuniary interest in the resolution of such disputes.

Considering this contention, the Court said:

"A rather vicious attack is made upon the Section of the Act (59–1703) which makes the Commission consist solely of dealers who are selected by the Governor from a list submitted by the Tennessee Automotive Association. The argument is, and, at least one of the briefs makes abrupt apologies to the present members of the Board for making this attack as not reflecting on them particularly, that by the very nature of a Board thus made up, the Board is biased and partial. It is said such a nonjudicial body which exercises at least quasi-judicial functions should not be allowed. We think the attack on this Section of the Act is entirely unjustified. As far as we know, our investigation certainly shows that practically all the regulatory boards which cover most everything today in the State are made up of members of the profession which that board governs. The reason for this is perfectly obvious.

"The Act now being questioned, to our minds, is closely related to the regulatory act regulating real estate agents and salesmen. They have a board which regulates, licenses, etc., as this one does, made up of people with knowledge of their profession. This Court in *Prosterman v. Tennessee State Board of Dental Examiners,* 168 Tenn. 16, 73 S.W.2d 687, held that identical provisions as to the dentists being members of these boards (Code 1932, sec. 6941 et seq.), as the automobile people are here, was not violative of Article 1, Section 8 of our Constitution, that no man shall be seized or deprived of property but by judgment of his peers, etc.; that the statute likewise did not violate Article 1, Section 17 of the Constitution in that the courts should be open to every person injured; and that it did not violate Article 6, Section 11 of our Constitution providing that no judge should preside over a trial or a cause or event in which he may be interested. The same reasoning applies to this board as applied in the *Prosterman* case. We could extend the reasons at length but we think they are obvious and it is not necessary to do so." 206 Tenn. at 575–76, 335 S.W.2d at 367.

The Court also held that the statutes did not improperly infringe upon the freedom of the parties to contract as they pleased. 206 Tenn. at 578–79, 335 S.W.2d at 368–69.

Similar statutes regulating the automobile business have been enacted in all but a few of the states.[1] As in Tennessee, these various states have "dealer licensing boards" or "franchise commissions" which are generally composed of motor vehicle dealers plus members of the public who represent consumer interests. These boards or commissions also are empowered to promote fair dealings in the automobile business by preventing various trade practices and abuses, identifying and protecting the interests of the consuming public, and protecting dealers against the overwhelming economic power and potential abuses thereof by manufacturers. Such legislation has been sustained in nearly all of the jurisdictions which have established such boards and commissions.

In the recent case of *New Motor Vehicle Board of the State of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Supreme Court of the United States sustained California statutes limiting the creation of new automobile dealerships in a "relevant market area" against attacks based upon due process and antitrust violations. The Court said:

"The California Vehicle Code explicitly conditions a motor vehicle manufacturer's right to terminate, open, or relocate a dealership upon the manufacturer's compliance with the procedural requirements enacted in the Automobile Franchise Act and, if necessary, upon the approval of the New Motor Vehicle Board." 439 U.S. at 105, 99 S.Ct. at 409.

Further, the Court said:

"Even if the right to franchise had constituted a protected interest when California enacted the Automobile Franchise Act, California's Legislature was still constitutionally empowered to enact a general scheme of business regulation that imposed reasonable restrictions upon the exercise of the right. . . .

"In particular, the California Legislature was empowered to subordinate the franchise rights of automobile manufac-turers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices. '[S]tates have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.'" 439 U.S. at 106–07, 99 S.Ct. at 410–11.

The 1977 statute stricken by the Chancellor provided that a manufacturer could be denied a license or could have a license revoked, in addition to being subject to other civil and criminal penalties elsewhere provided,[2] if such manufacturer:

"Has granted a competitive franchise in the relevant market area previously granted to another motor vehicle dealer. Relevant market area as used herein shall mean that area as described or defined in the then existing franchise or dealership of any dealer or dealers, [provided] however, that if the manufacturer wishes to grant such a franchise to an independent dealer or to grant an interest in a new dealership to an independent person . . . , then the manufacturer shall give written notice to the existing dealer or dealers in the area and the matter shall be submitted to the commission for final and binding action under the principles herein prescribed for a determination of the relevant market area, the adequacy of the servicing of the area by the existing dealer or dealers and the propriety of the granting of such additional dealerships." T.C.A. § 55–17–114(c)(20).

■ The Chancellor found that the statute created a "nebulous" procedure for handling of claims such as this. The prescribed procedures, however, are those contained in the Uniform Administrative Procedures Act. T.C.A. §§ 4–5–101 through 130. The amended statutes provide for hearings conducted by an independent hearing officer from the office of the Secretary of State, as was done in the present case. T.C.A.

---

**1.** *See* Note, 33 *Vand.L.Rev.* 385 (1980).

**2.** T.C.A. § 55–17–117.

§ 55–17–115. We find nothing vague or unconstitutional about the statute or about the procedures to be followed.

■ The 1977 Act governing the granting of new facilities directs the Commission to proceed upon "the principles herein prescribed." The Chancellor found no such principles to have been enacted. We respectfully disagree. The quoted phrase is from a very broad and comprehensive statute governing many facets of the relationship between manufacturers and dealers, and it seems to us that the Legislature clearly intended that all of these, together with any other relevant circumstances brought to the attention of the Commission by the parties, should be taken into account in determining the "propriety" of granting an additional dealership. General Motors itself had little difficulty in stating its criteria for creating a new franchise. These involved relevant market factors, including sales potential, and the interests of existing dealers. Obviously the Commission should consider these, together with the interest of the consuming public and past relationships between the manufacturer and its existing dealers. For example if the manufacturer proposed to open a new dealership because an existing one had refused to accept undesired merchandise which the manufacturer had attempted to foist upon it, or if an existing dealer had refused to accede to any other improper or proscribed demands by the manufacturer, the Commission could certainly take these factors into account in determining whether to approve an application.

■ The Chancellor stated that the only persons having an interest in opposing a new franchise were existing dealers. Again we disagree. Each dealership has dozens, perhaps hundreds, of employees; it has financial obligations to banks and other creditors; it usually has contracts for services and supplies. All of these persons, as well as the dealer, have an interest in the matter, as does the consuming public itself in having financially sound dealerships at which to purchase automobiles and to have them serviced. It is rather clear from the brief of General Motors that it would not hesitate to create additional franchises at will, based only upon its own criteria, if its right to do so had not been regulated by the General Assembly with a view to having all relevant factors taken into consideration, particularly the interest of the public in the purchase and the servicing of motor vehicles. The statutes in question license not only dealers and manufacturers but sales personnel as well, specifying that the latter shall only be licensed when employed by a duly franchised and licensed dealer. There are many, often conflicting, interests to be considered by the Commission, subject to judicial review, in approving a new dealership or in terminating an existing one.

■ In effect the Chancellor held that no licensed motor vehicle dealer could sit as a member of the Tennessee Commission in a dispute with a manufacturer because each would inevitably have a substantial pecuniary interest in the result of such a case. This contention was rejected in *Pace, supra,* and, insofar as we are aware, has been sustained in no jurisdiction except by the intermediate California decision above referred to. In that case the statute mandated that four of nine persons sitting on the state commission be automobile dealers. Insofar as we can determine, the California court did not prohibit dealer-members per se, and it invalidated the California statute only because of a combination of factors including the requirement that four members be dealers. This was a two-to-one decision and apparently is the only case so holding. A similar contention was rejected by the Supreme Court of Georgia in *General GMC Trucks, Inc. v. General Motors Corp.,* 239 Georgia 373, 237 S.E.2d 194 (1977), *cert. denied,* 434 U.S. 996, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977). The Georgia statute required that five of the nine-member commission be franchised dealers. Reversing the holding of a trial court that such a commission must necessarily be prejudiced, the Supreme Court of Georgia said:

"The mere fact that a majority of the commission members are franchised dealers is not in itself dispositive of the issue.

It is a common and acceptable practice to appoint members of a profession, business or trade to oversee the practices of that group. . . . Members of a commission are presumed to be fair and impartial. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *United States v. Morgan,* 313 U.S. 409 61 S.Ct. 999, 85 L.Ed. 1429 (1941). General Motors Corporation and Trade City have failed to overcome that presumption. Therefore we conclude that the trial court erred in holding that the commission was per se unconstitutional." 237 S.E.2d at 195–96.

■ It is conceded by General Motors that the Tennessee statute is "neutrally worded" insofar as the composition of the Commission is concerned. Since the 1977 amendment the statute has provided for an eleven-member commission, two of whom are to be consumers having no direct or indirect interest in the automobile business. The other nine "industry members" are to be appointed by the Governor. The only requirements for eligibility are that they be persons of good moral character, that they be licensed personnel under the statute, and that they have been engaged in the manufacture, distribution or sale of motor vehicles in the state for at least five consecutive years prior to their appointment. A member may be engaged in more than one licensed activity.

There are no restrictions upon appointment by the Governor, except that appointments are to be made from a list of eligible persons submitted by the Tennessee Automotive Association. The latter is a trade association, about which there is very little testimony in the record. It appears that any licensed dealer, manufacturer, or distributor may be a member of that association. Its board of directors submits lists of eligible persons to the Governor. There is no requirement that the Governor accept any particular nominee, or that he accept an original list submitted. The Governor can reject all nominees submitted to him by the Association until such time as he receives nominees whom he approves. Under the statute, the Commission could be composed entirely of manufacturers' representatives, distributors or sales personnel. There is no requirement that they be members of the Association. At the time of the hearings involved in the present case the Commission was in fact composed of nine dealer members and two consumer members, but this is a result of action by the Executive Department of the state and not by legislative mandate. The statute, therefore, on its face is clearly neutral insofar as the composition of the Commission is concerned and does not require that there even be one dealer member, if the Governor does not see fit to appoint one.

■ We are simply unable to accept the premise, apparently adopted by the Chancellor, that no automobile dealer could serve fairly on a commission such as this. Nor in fact has there been shown any degree of bias, prejudice, impropriety or incompetency on the part of a single member who participated in the decision in the present case. Only eight members of the Commission were present. One of these was a consumer member. Another was the chairman who presided but did not vote, since he only votes when there is a tie among the remaining members. The hearing itself was conducted by an independent hearing officer as to whose qualifications no objection has been raised. Of the eight members participating in the hearing, only one had a dealership in the "relevant market area" as defined by the Commission.[3] If that area should be defined as insisted by General Motors—an issue which we do not here decide—then none of the members who voted had a dealership within the relevant market area.

■ It is insisted by General Motors and was held by the Chancellor that dealers may not participate in a decision even though they are franchised by the manufac-

---

**3.** This was a Ford dealership in Gallatin, and this member was the chairman, who did not vote.

turer of a wholly different "line-make." For example the Chancellor found that a Ford dealer in Shelbyville had a substantial and direct pecuniary interest in the outcome of the granting of a Chevrolet dealership in Nashville. This is so attenuated and speculative, in the absence of proof of actual interest or bias, that we simply are unable to accept it. Dealers in other line-makes than the proposed franchisee are not even required to be notified of a proposed additional franchise, nor are they shown to have any interest that would disqualify them from passing upon a contested issue with regard to the creation or termination of a franchise from a wholly different manufacturer.

After this case reached the Chancery Court it developed into a contest between General Motors Corporation and the Tennessee Motor Vehicle Commission, rather than a review on the merits of the proposed franchise. The Chancellor permitted General Motors to take the depositions of three of the Commissioners who participated in the hearing in an effort to show bias or prejudice on their part. The depositions were wholly unavailing for that purpose. No impropriety was shown by these depositions, nor has there been any proof of any substantial pecuniary interest on the part of any member of the Commission in the result of this case. The one dealer-member who was a protestant in the case recused himself, and there has been no showing of any improper communication or relationship between him and the other members of the Commission, as suggested by General Motors.

■ Only by innuendo, suggestion and, as stated by this Court in the *Pace* case, *supra,* an "attack" upon the personnel of the Commission has there been any suggestion of bias or partiality whatever. The application in question was first made in 1977. It was rejected by the Commission after a full hearing. No appeal was taken from that decision. The application was renewed in 1979 and again denied after a very lengthy hearing, the voluminous rec-

ord of which we have considered in its entirety. The issues were controverted from beginning to end on almost every point. Some tribunal had to resolve them. The decision of the Commission is subject to judicial review under the Administrative Procedures Act. If it committed a legal or factual error, the courts may review it as provided in that Act. This record, however, does not justify striking down this tribunal as being unconstitutionally composed or impartial and biased as a matter of law.

The Chancellor relied primarily upon *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) and its predecessors in holding the Commission in the present case improperly constituted. That case is clearly distinguishable on the facts and we do not find it to be in point with respect to the composition of the Commission presently under consideration.

■ The Chancellor and General Motors have suggested that there is such camaraderie among dealer-members as to make it impossible for one not to wish to favor a fellow dealer in a contested case. This is said by the Chancellor to be a "recognition of the realities of human nature." In the absence of actual evidence on this point, we are unable to accept this rationale. It seems to us, if we were to speculate upon such "realities," that an Oldsmobile dealer in Memphis would be more inclined to favor General Motors in its contest with Nashville Chevrolet dealers than to favor the latter. His very economic existence, in all of its facets, depends entirely upon General Motors and its supplying to him of sufficient salable merchandise. The "realities" of the situation are that the manufacturer is dominant in every respect over the dealers. It was partly because of this obvious disparity in economic power with its potential—and, historically, actual—abuses that statutes such as those in question were enacted.

■ There is no suggestion in this record of impropriety on the part of General Motors, or undue pressure by it upon its

franchised members of the Commission;[4] on the other hand the record is equally devoid of actual bias, prejudice or impropriety by the participating members. The suggestion that it could "possibly" exist and that the Commission therefore must be stricken is, in our opinion, untenable. The "possibility of temptation" in favor of a manufacturer seems to us as strong or stronger than such a possibility in favor of another dealer-member. In *Gibson v. Berryhill, supra,* the Supreme Court made it clear that only those "with substantial pecuniary interest in legal proceedings" should be disqualified. 411 U.S. at 579, 93 S.Ct. at 1698. No such interest for or against either of the opposing sides has been demonstrated in the present case. The decision of the Chancellor is accordingly reversed.

▪▪▪ The contention of General Motors with respect to the commerce clause was considered and rejected by this Court in *Ford Motor Co. v. Pace, supra,* and need not be further considered. We find no merit whatever in the suggestion of General Motors that the statutes in question purport to create a monopoly and do not consider that the matter warrants extended discussion.

The Chancellor found that the Commission had erred in defining the "relevant market area" in the present case, although he stated that he did not have before him the evidence upon which that decision was based. That decision was made in connection with the 1977 hearing, and it apparently was adhered to in the present case. If General Motors wishes to have that issue reviewed, it is incumbent upon it to produce before the Chancellor a sufficient record from which the determination can be made. In all events, that is not a question of constitutional dimensions and is not presently before us.

The judgment of the Chancellor is reversed and the cause is remanded for further proceedings consistent herewith. Costs of the appeal are taxed to appellee.

FONES, C.J., and COOPER, BROCK and DROWOTA, JJ., concur.

---

4. Four of the six voting "industry members" of the Commission held General Motors franchises.