541 A.2d 653

**SOUTHLAND CORPORATION 7–ELEVEN STORES**

v.

**MAYOR & CITY COUNCIL OF LAUREL.**

No. 617, Sept. Term, 1987.

Court of Special Appeals of Maryland.

June 3, 1988.

**376**

Robert H. Levan and Bernard A. Cook (Levan, Schimel, Richman & Belman, P.A., on the brief), Laurel, for appellant.

James F. Maher, City Sol. (Dwight W. Clark and Maher & Maher, Chartered, on the brief), Laurel, for appellee.

Argued before GARRITY, ALPERT and ROBERT
M. BELL, JJ.

GARRITY, Judge.

We are asked to decide whether the City of Laurel may
properly reject a use of real property through its site
development review procedure, even though the proposed
use is generally "permitted" under the applicable zoning
ordinance.

*Facts*

The subject property (the Property) is located in the
northwest quadrant of the intersection of Route 1 (south-
bound) and Main Street, within the City of Laurel (City).
The Property is zoned General Commercial (C–G) and is
located in the city's historic district. U.S. Route 1 is a
divided highway with various businesses located in the
median between the northbound and southbound lanes, each
consisting of four lanes. Main Street, which is perpendicu-
lar to and intersects at both the southbound and northbound
lanes of Route 1, runs in an east-west direction. There are
traffic signals located at both of these intersections. Main
Street abuts the southerly boundary of the Property, and
U.S. Route 1 southbound abuts its easterly boundary. The
northerly portion of the Property is bounded by Tolson
Alley. Tolson Alley intersects with southbound Route 1
and runs westerly, where it crosses "A" Street.

Southland Corporation, 7–Eleven Stores (Southland) pur-
chased the property with the intent to improve it with a
7–Eleven convenience store. To this end, Southland sub-
mitted a site plan in conjunction with a building permit
application to the Laurel Planning Commission in October
of 1985. It is undisputed that the convenience store, retail-
ing foods and beverages and containing less than 5,000
square feet of retail space, is permitted under the C–G
zoning classification set forth in Section 20–27.04.a.(1) of
the City of Laurel Zoning Ordinance.

Southland's proposal met all of the preliminary regulations which led to a recommendation of approval by the Laurel Planning Staff. This recommendation was rejected, however, by the Planning Commission on November 12, 1985. Traffic safety was the paramount concern of the Planning Commission.

Shortly thereafter, Southland submitted a modified site plan. On February 11, 1986, this plan was also rejected by the Planning Commission due to traffic safety concerns. Southland then submitted a revised final site plan, which was again rejected on May 13, 1986, by the Planning Commission. Again, the primary reason articulated for its rejection was that the site plan, if instituted, would create a hazard to vehicular and pedestrian traffic.

Southland, in the meantime, had acquired approval from all other requisite city and state committees including the Historical District Commission, the Public Works Department of the City of Laurel, and the State Highway Commission. Southland appealed the Planning Commission's determination to the Board of Appeals for the City of Laurel which conducted a *de novo* hearing. The Board of Appeals upheld the Planning Commission's decision. Thereafter, the Circuit Court for Prince George's County (Blackwell, J.) affirmed the action of the Board of Appeals.

## *Discussion*

Southland argues, in essence, that the "impact of uses" is a matter that is decided by the City's legislative body at the zoning stage. Once that decision is made, regardless of adverse effects, a property may be developed in accordance with any of the permitted uses. Thus, the Planning Commission and the Board of Appeals, acting as quasi-judicial rather than legislative bodies, "cannot, as a rationale for denying a building permit, determine that a permitted use is inappropriate for a site."

The City argues, on the other hand, that it has exclusive planning and zoning authority within its corporate bound-

aries. Thus, it has the authority to delegate to its Planning Commission the right to make decisions as to the "use of property" in connection with the site development process pursuant to standards set forth in the ordinance, which includes the satisfaction of safety conditions.

The City of Laurel, a municipal corporation, has been granted very broad home rule powers pursuant to Article XI–E, Section 3, of the Maryland Constitution and Article 23A of the Annotated Code of Maryland. Article 23A, Section 2, provides in pertinent part, that municipalities

shall have *general power* to pass such ordinances not contrary to the Constitution of Maryland, public general law or ... public local law as they may deem necessary in order to assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, *to secure persons and property from danger* and destruction, and to *protect the health,* comfort and convenience of the citizens of the municipality.... (emphasis added).

This court stated in *Campbell v. Mayor and Aldermen of the City of Annapolis,* 44 Md.App. 525, 532, 409 A.2d 1111 (1980):

One of the objectives of home rule was to assure Maryland municipalities the power of self-government.... The intent of Article XI–E was specifically to grant Maryland municipalities the *power to control their own local affairs,* and was designed to *permit local legislation to be enacted solely by those directly affected....* (emphasis added).

The Court of Appeals noted in *Mayor and Aldermen of the City of Annapolis v. Annapolis Waterfront Company,* 284 Md. 383, 396 A.2d 1080 (1979):

Article 23A, implementing Article XI–E, Section 3, only establishes *minimum requirements* regarding municipal affairs. Municipalities are free to provide for additional standards and safeguards in harmony with concurrent state legislation.

. . . .

Thus, where a municipal legislative body has enacted a zoning ordinance under the powers granted by the General Assembly, a presumption of validity attaches to that act as an exercise of the police power. (citations omitted). Further, we have held that the courts of this state are without power to interfere with "any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion.

*See also Joy v. Anne Arundel County,* 52 Md.App. 653, 657, 451 A.2d 1237 (1982).

As to the City of Laurel in particular, it is clearly established that it is empowered with exclusive planning and zoning authority within its corporate boundaries. *Prince George's County v. Mayor and City Council of Laurel,* 262 Md. 171, 277 A.2d 262 (1971). Pursuant to that authority, the City enacted a site development review process. That process, in accordance with the Laurel Zoning Ordinance, is an integral part of the building permit/use and occupancy permit procedure. Section 20–8.03 of the Laurel Zoning Ordinance requires that the site and development plans be submitted to the Planning Commission to allow its evaluation of the building or development. Section 20–8.04, entitled "Conditions," provides:

a. The use and occupancy permit shall be issued only upon a finding that the use proposed in the application will not:

(1) Affect adversely the health, safety, or morals of persons residing or working in the neighborhood of the proposed use.

(2) Be detrimental to the public welfare or injurious to property or improvements in the neighborhood.

(3) Constitute a violation of any provision of this ordinance.

b. The planning commission or the Director of Planning, Zoning, and Permits may attach such conditions to

the approval of the use permit as it deems reasonable and necessary to assure that the proposed use will be consistent with the purpose and intent of this ordinance.

In *Tighe v. Osborne*, 150 Md. 452, 133 A. 465 (1926), it was held that the City of Baltimore could delegate limited discretion to its Zoning Commissioner to determine whether a proposed building or use would menace the public security, health or morals. The Court observed:

[I]t has been found practically impossible to provide in laws and ordinances specific rules and standards by which every conceivable situation can be measured and determined. The result has been that we have turned more and more to the plan of providing in our laws and ordinances general rules and standards, and leaving to administrative boards and agencies the task of acquiring information, working out the details, and applying these rules and standards to specific cases. This is not considered a delegation of legislative authority though it probably does represent an expansion of administrative power.

. . . .

Such ordinances represent no change in principle. They merely indicate that the courts, faced by at least an apparent necessity, have relaxed to some extent the particularity with which they formally required the laws and ordinances to set out the rules and standards by which the delegative power was to be limited, and whatever may be said of the wisdom of this relaxation no doubt can now be entertained as to its sanction by the great weight of authority in this country.

*Id.* at 463, 133 A. 465.

There is no question that the City of Laurel has the authority, by virtue of its police power, to enact a zoning ordinance in the interests of public safety. We hold, in furtherance of that mission, it may properly delegate to its Planning Commission the authority to determine whether a

proposed building or use, due to its proposed location, would create a public safety hazard.

A similar question to that we are dealing with in the case *sub judice* was posed by Southland to the California Court of Appeals in *Wesley Investment Co. v. County of Alameda*, 151 Cal.App.3d 672, 198 Cal.Rptr. 872 (1984). In *Wesley*, Southland sought to construct a 7–Eleven store in an area zoned for retail stores, as in the case at bar. So too did that ordinance provide that any applications were subject to site development review. The purpose of the ordinance was cited as follows:

> [T]o promote orderly, attractive, and harmonious development, recognize environmental limitations on development, stabilize land values and investments, and promote the general welfare by preventing establishment abuses or erection of structures having qualities which would not meet the specific intent clauses or performance standards of this Chapter or which are not properly related to their sites, surroundings, traffic circulation, or their environmental setting. Where the use proposed, the adjacent land uses, environmental significance, or limitations, topography, or traffic circulation is bound to so require, the planning director may establish more stringent regulations than those otherwise specified for the District.

*Id.* at 676, 198 Cal.Rptr. 872.

The Court pointed out that a permitted use under the ordinance did not equate to an absolute right to erect a convenience store. On the issue of the delegation of power to the Planning Director, the Court observed:

> Wesley claims that the county has improperly delegated its zoning legislative power by giving the department, the director, and the commission the right to deny a " 'permitted' use." In particular, Wesley questions " . . . the validity of a 'general welfare' standard which allows the administrative body to ignore the' legislature's mandate and to legislate new zoning policy into existence." We agree with the county's position on this point: "Neither the Planning Director nor the Planning Commission

on appeal, (acting as administrative bodies) are 'ignoring the legislature's mandate.' The direct opposite is the fact; that is, they are *following* the mandate of the ordinance which allows them to exercise their judgment so as to *deny* a Site Review application. In no way are they either authorized nor are they pretending here to 'legislate new zoning policy.' All they are doing is administering existing zoning policy, which policy is set forth in the Site Review sections of the county ordinance."

*Id.* at 679, 198 Cal.Rptr. 872.

 Having concluded that the ordinance empowered the Planning Commission to make such a decision, we must now determine whether there was sufficient evidence before the Board of Appeals to make the issue of traffic safety fairly debatable. In other words, we will not substitute our judgment for that of the Board of Appeals if the issue is fairly debatable and the record contains substantial evidence supporting the decision of the Planning Commission.

The standard for reviewing administrative actions is set forth in *Annapolis v. Annap. Waterfront Co.*, 284 Md. 383, 395–96, 396 A.2d 1080 (1979), and is as follows:

When reviewing an administrative decision for arbitrariness or capriciousness, a court must first determine whether the question before the agency was "fairly debatable":

We have made it quite clear that if the issue before the administrative body is "fairly debatable", that is, *that its determination involved testimony from which a reasonable man could come to different conclusions,* the courts will not substitute their judgment for that of the administrative body, in the absence of an unconstitutional taking of private property for public use without the payment of just compensation. *Brouillet v. Eudowood Shopping Plaza, Inc.*, 249 Md. 606, 241 A.2d 404 (1968); *Creative Country Day School, Inc. v. Montgomery*

*County Board of Appeals,* 242 Md. 552, 219 A.2d 789 (1966); *County Council for Montgomery County v. Gendleman,* 227 Md. 491, 177 A.2d 687 (1962).

Part of the evidence presented to the Board of Appeals included testimony by traffic experts: John W. Guickert testified on Southland's behalf and Kenton J. Balenske testified on behalf of the City of Laurel. Both experts conducted traffic counts. Mr. Guickert testified that there was no site distance problem, and, absent that, he did not see the need to prepare an accident analysis report. Mr. Guickert also admitted that the study did not specifically address traffic safety, but he stated that the traffic impact analysis and traffic safety go "hand-in-hand."

Mr. Balenske, on the other hand, in addition to conducting traffic counts, conducted turning movement counts and a queuing analysis to determine the number of cars which would be queued at the nearby intersections during peak traffic hours. Mr. Balenske, in his report dated December 17, 1985, observed:

A queuing analysis was performed during lunch and PM peaks. A queue of 5 or more cars effectively blocks both the alley and the driveway from the proposed site. During the lunchtime peak hour, approximately 75% of the cycles on southbound Route 1 experienced queues of 5 or more passenger vehicles with over 90% in the peak 30 minutes. During the PM peak hour, over 95% of the cycles had queues in excess of 5 cars. In the peak 15 minutes, every cycle experienced queues in excess of 15 vehicles. During these periods, it would be virtually impossible to exit the site and cross Rt. 1 to turn left on Main; the turn onto southbound Rt. 1 would be difficult but possible.

In summary, this location and use present several potential traffic safety problems. The close proximity of the driveways from this site to southbound Rt. 1 combined with the long queues experienced during the peak periods will result in potentially hazardous conflicts on southbound Rt. 1. These conflicts are magnified by this

usage which has very high peak hour generation which tends to correspond with the peaks in the adjacent road. Thirdly, increases of traffic in the alley are undesirable due to inadequate width and sight distance at the point where the alley meets "A" Street. Finally, the high historical traffic increases (which are expected to remain high) will cause increased queues and further conflicts in the short-term future. From a traffic safety standpoint, a user with lower generations on off peak generation rates would be more desirable.

In a later report, Mr. Balenske conducted tests with respect to the trip generation peaks and concluded that they coincided with the peaks in traffic during rush hours. Again, he concluded:

U.S. Route 1 experiences very sharp peaks in the AM, PM, and lunch rush hours. ITE generation rates for convenience stores indicate in excess of 120 trips in the AM and PM breaks with the lunch peaks probably higher. Since the street peaks and generated peaks coincide, the potential conflicts are high. The future increases in traffic along Route 1 will heighten these conflicts. As a result, virtually every car which exits the proposed site will have to weave out across the right lane of southbound Washington Boulevard (used primarily by moving right turning vehicles) and merge into a queue of stopped vehicles in the second lane.

We feel the proposed location will be highly hazardous and that accident occurrence will rise greatly if a high peak hour generator is allowed on this site.

Mr. Frank Persico testified as a resident of Laurel and on behalf of the City of Laurel Public Safety Committee (hereinafter "PSC") of which he was a member. He introduced a letter from the PSC dated June 19, 1986, recommending against the proposed use because it was the PSC's opinion that the traffic generated by the use would present a public safety hazard. Mr. Persico noted that the PSC is made up of citizens, including members of the Laurel Volunteer Rescue Squad, the Laurel Fire Department, the Laurel

Police Department, and City Council members, that this matter was considered by the committee on at least three occasions, and that it had reviewed the traffic reports.

Mr. Persico and William Souders, another resident of Laurel, both testified that based upon their personal observations, the construction of the 7–Eleven at the corner would present a significant traffic hazard. Both pass by the intersection several times a day. They further testified that if truck drivers parked illegally to frequent the store, as they do at several other 7–Eleven locations, that would also create a severe traffic problem.

We hold that there was sufficient evidence presented to the Board of Appeals to make the issue of whether the proposed use would create a public safety hazard at the site, due to traffic concerns, fairly debatable. We, therefore, shall affirm the judgment of the Circuit Court for Prince George's County.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.