665 A.2d 327

**SHEETZ, INC., et al.**

v.

**FREDERICK CITY PLANNING COMMISSION.**

**No. 1967, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Sept. 29, 1995.

G. Randall Whittenberger (Miles & Stockbridge, on the brief), Frederick, for appellants.

Natalie Lynn Board, City Attorney (Robert J. Kresslein, on the brief), Frederick, for appellee.

Argued before FISCHER, HARRELL and HOLLANDER, JJ.

FISCHER, Judge.

Appellants, Sheetz, Inc., Deane Savage, and Barbara Rogers (Sheetz), appeal from an order of the Circuit Court for Frederick County. The Frederick City Planning Commission (Planning Commission) held a public meeting on March 14, 1994, and denied Sheetz's proposed site plan for the construc-

tion of a convenience store with six gas pumps. Sheetz appealed to the circuit court, which heard arguments on the merits and then affirmed the Planning Commission's decision. Sheetz presents the following issues for our review, which we have reworded for clarity:

I. Whether the Planning Commission violated Section 6.08 of the Frederick City Zoning Ordinance by failing to provide Sheetz an opportunity to make "reasonable changes" to the proposed site plan.

II. Whether the Planning Commission violated Maryland and Federal Constitutional law by failing to provide specific findings and reasons to support its determination.

III. Whether the Planning Commission usurped the legislative function by prohibiting the applicants from using their property for a convenience store, when such use has already been legislatively determined to be compatible under the B–3 zoning category.

IV. Whether the Planning Commission's decision to deny the permissible B–3 use without compensation constitutes an unconstitutional taking.

V. Whether the Planning Commission's denial of the site plan application was arbitrary and capricious.

## FACTS

Sheetz owns a 7.71 acre parcel of property located at the southeast corner of Rosemont Avenue and Shookstown Road in Frederick, Maryland. The Frederick City Board of Aldermen (the city's legislative body), which has the authority to establish zoning districts, zoned the Sheetz parcel B–3,[1] General Commercial in 1986. Section 3.03(3) of the Frederick City Zoning Ordinance[2] (Zoning Ordinance) states:

---

1. Based on our review of the record, we could not tell whether all 7.7 acres of the Sheetz parcel were designated B–3 or only the 1.3 acres at issue in this case.

2. Hereinafter, all references to "Section" are from the Zoning Ordinance, unless otherwise specified.

*General Commercial, B–3.* The B–3 district is intended to provide areas for major retail, service and other business activities that will serve the general commercial needs of the community at large. Special care must be taken in development review to minimize the impacts of the high-traffic and other potentially disruptive activities.

Furthermore, Section 4.02(3)(6) states that accepted commercial uses for a B–3 site include that of a convenience store and gas station.

Sheetz applied to the Planning Commission in 1993 for final site plan approval of its plan to build a convenience store with six gas pumps on 1.3± acres of the Sheetz parcel. Sheetz supplied the Frederick City Planning Department and other state agencies with the site plan, supporting documents, and a traffic study. All required state and local agencies received, reviewed, and commented on the Sheetz site plan.

On March 14, 1994, the Planning Commission held a public meeting[3] for final review of the Sheetz site plan. The Zoning Administrator spoke first and testified about the city staff's concerns with the site plan, which included existing and potential problems with traffic and safety. An assistant city engineer and the City Attorney testified next and briefly described the timing of future improvements to Rosemont Avenue. The engineer testified that improvements to Rosemont Avenue would alleviate some of the traffic problems at the Shookstown intersection.

---

3. Although described as a "public meeting" in § 6.08(1) (action by Planning Commission) of the Zoning Ordinance, § 6.04(2) (public notice requirements) refers to it as a "hearing." It is clear to us, from our review of the record extract, that by whatever name it is called, the Planning Commission conducted a quasi-judicial, evidentiary hearing on the site plan, not to be confused with a legislative-type, public meeting. *Cf. Sugarloaf Citizens Ass'n v. Northeast Maryland Waste Disposal Auth.,* 323 Md. 641, 594 A.2d 1115, *recon. denied,* 323 Md. 659 (1991) (where "contested case," adjudicatory hearing under State APA distinguished from legislative-type, public hearing for purposes of State's three-step approval process for proposed facilities that may affect ambient air quality).

Sheetz called three witnesses: an engineer, a traffic expert, and a representative of Sheetz, Inc. The engineer testified that he believed the Sheetz plan satisfied the Zoning Ordinance. The traffic expert gave the Planning Commission an updated traffic study and concluded that the Sheetz plan would not present a traffic safety hazard.

The Planning Commission heard all the testimony, including numerous outbursts from the public gathered at the meeting. Each Planning Commissioner stated his or her own difficulties with and reasons for rejecting the Sheetz plan. Their closing statements ranged from legitimate safety concerns to personal value judgments not established in 6.07(2).[4]

MR. HUDSON: I don't want you to get too excited when I say this but my impression is that even if we offer a continuance and we get some additional information, that we're still going to come up with basically the same kind of feeling among the members of the Commission and that is that No. 1, we understand that each of us owns a piece of property and wants to develop it to its highest and best use. *That doesn't mean that if a shooting gallery was an acceptable use on this site that I would—and you passed all the requirements ... that I would think it would be a use that I would want to approve.* One (1) of the things that you've indicated is that you anticipate a level of use on this site of about three thousand (3,000) vehicles a day.... [I]f you ran that over the full twenty-four (24) hour period, you were having someone go in and out once every half second or half minute,.... And I know it doesn't work that way.... You can count the traffic till you're blue in the face and I accept what has been presented by Mr. Lewis [appellant's traffic expert] as being accurate.... [T]his kind of a use at this particular location would be something that I would be

---

4. Throughout the course of the site plan review, the Planning Commission members looked at other criteria not found in the Ordinance. For example, during the course of questioning a Sheetz witness, Planning Commission member Ms. Murphy stated, "[Y]ou may be following the Ordinance but as a body up here, *we have a right to look at other things....*" (Emphasis added.)

in favor of denying until such time as the entire traffic picture is clarified, until such time as the improvements would be made out on Rosemont Avenue extended beyond Military Road.... [I]f I had the five (5) lanes of traffic today, if I had the left turn lane, if I had the right in, right only turn on this site, I would still feel that the number of vehicles ... for this kind of usage would severely impact the safety of that particular area ... I've been out there and witnessed this area many different times of the day and evening,.... But I have witnessed that and I do know that there is a problem out there. There is a problem that relates itself also to pedestrian safety, although I don't expect a hundred (100) people will run across the street from the area north of Rosemont to get to Sheetz or any other activity there. This becomes a dangerous place to have pedestrian activity.... [W]hile I truly understand that the City ... zoned this land B–3, *I do believe that somewhere in the category of what is permitted for this Commission to do is to consider, even though there are permitted uses indicated on our chart showing that a gas station, a convenience store is a permitted use in the B–3, I think that someone, some judge somewhere might think that we should be responsible enough to look at a particular situation and decide that this doesn't look quite right to me, it doesn't look like something that I would like to stand up and say would be the right kind of a usage at this time.* So I'm telling you I would recommend denial based on the information that has been given to us by the Police Department and based on indication that has been given to us from the neighborhood, the people who are effected, based on their own intelligence and based on the traffic situation that is there, that this would compound an already bad situation.

．　　．　　．　　．　　．

MR. WILLIAMS: I agree with that. I'd be perfectly willing to go through the—the stress of sitting through another meeting. I feel that the applicant may have a desire for extension, continuance, and that might make sense if the things that have been proposed would make a

substantial difference. My feeling is that what we're dealing with here is a safety situation.... I think that even with the improvements that are shown ... the improvements are not adequate to do what is being proposed and those improvements would not be sufficient to remove the barrier that has been proposed. It's conceivable that if further improvements were made to the east, that might be sufficient to reconsider.... *The property is zoned B–3 and the owner has a right to make some reasonable use out of it.... [B]ut what is being proposed is very substantial and I think very dangerous and I'm opposed to it.*

*MR. HALL: The same thing applies with me ... I think our responsibility is to the people who are sitting out there.... [A]t one point in time, you have to say that's enough. As far as I'm concerned, this is enough.*

MS. MURPHY: Well, I'm going to have to agree with my colleagues ... I think that this particular use for this property is too intense. I think that it has a detrimental effect on the residential neighborhood across the street.... These are older homes and these people have worked very hard to protect their residential neighborhood. *There are plenty of other permitted uses in B–3 and I think that the owner can find something that is not as intense....* But my biggest concern is what this is going to do to the residential neighborhood in front of the property and behind it ... so, I'm against it.

CHAIRMAN SUMMERS: We all seem to agree up here but all of you should remember that the property is zoned B–3. [Emphasis added.]

In the face of these critiques, Commissioner Hudson asked if Sheetz would like a continuance in order to "massage this [the submission] one time" and return for another attempt at getting approval.[5] Though the record reflects as substantively

---

5. The sincerity of this offer is questionable, given the apparent negativism expressed by the Planning Commissioners concerning Sheetz's ability to revise the submission in a manner that would satisfy them. Commissioner Hudson stated:

"inaudible" how Mr. Severn, Sheetz' attorney, responded to this query, Mr. Hudson next made a motion for denial. The substance of his motion was:

In light of that, I'll make a motion for denial. The reasons for denial are that there are a number indicated a total number of possible three thousand (3,000) trips which would relate to an intensive use of the property and that—that would mean, perhaps, one (1) vehicle every thirty (30) seconds or more that would enter the property and in high traffic periods, it would be much worse. I deny this on the basis of this particular development would have a negative impact on the neighborhood. I believe that the safety of the traffic traveling west and east on Rosemont and the safety of the traffic traveling north on Shookstown Road in particular make this a particularly serious traffic hazard. I believe that the recommendation from the City Attorney that we may be exacerbating—I hate that word—we might be making the situation a lot worse—let's call it like Americans—we would be making the traffic situation a lot worse than it currently is and we already know it's in—it's a serious problem from the reports that we have from the Police Department that this might present the City with a possible problem of litigation from increasing traffic in an already dangerous area. I believe that the planned public improvements from Military Road west are not in place, cannot give relief to this particular heavy increase of traffic within the next year. I believe that the acquisition of the property from—on Rosemont Avenue from Military Road east towards Biggs is currently not developed to an extent where we really know where we will be in the next year or two (2) and that become a—a—an unknown of sorts that we

---

I would be amenable to seeing you come back in with whatever suggestions you want to come in with but I have to tell you it's like climbing a mountain and you're really down in the valley and I am sitting up there on the top and I'm not really believing you're going to get to where I am safety-wise or otherwise.

Thus, it appears it did not matter how adept of a "mountain climber" Sheetz may have been; there was little or no chance of satisfying the Planning Commission.

can't rely on at this particular moment. The other indica-tions are that the traffic study, and I have checked with you on this, Cathy, my impression is that, Cathy, that the traffic study still would need to be revised at this point to reflect some of the requests from the City Engineer and the staff's point of view. Would that be correct?

. . . . .

And one (1) more comment, this also reflects some of the comments that were in the memorandum regarding this from the Frederick County Department of Public Works where they indicated that, in summary, aside from the capacity issues, if it were a County application, this division would recommend you deny access to Rosemont Avenue from the safety standpoint, not that we have to agree with the County but no comment was made on that an this was a comment from another source, which I want us to be aware that we have had and I don't know whether I have anything else. You want me to include anything else, Mike?

The motion for denial was unanimously approved.

Pursuant to Section 6.10, Sheetz appealed to the Circuit Court for Frederick County. In a written opinion, the circuit court affirmed the Planning Commission's decision. It held that the Planning Commission: (1) did not violate Section 6.08(2); (2) did not usurp a legislative function by rejecting the Sheetz site plan; (3) did not unconstitutionally take Sheetz' property without just compensation; (4) provided sufficient findings of fact, and (5) did not rule in an arbitrary and capricious manner. A timely appeal was filed with this Court.

## DISCUSSION

### I.

■ Sheetz argues that the Planning Commission failed to follow Section 6.08(2) of the Zoning Ordinance by not provid-ing Sheetz with "reasonable changes" for its site plan before the Planning Commission rejected its proposal. Section 6.08 provides, in pertinent part:

(1) The Planning Commission shall review those applications for site plan approval described in Section 6.06(1) at a public meeting. All interested persons shall have the right to appear and speak concerning the application.

(2) The Commission shall require any reasonable changes to the proposed site plan which it considers necessary to comply with the requirements of this Ordinance and assure compliance with criteria of Section 6.07(2). If these changes are not made, the Commission shall deny the application.

We are left with the question of whether Section 6.08(2) is proactive or reactive in nature. If the provision is proactive, the Planning Commission must suggest "reasonable changes" to the applicant before rejecting any proposal. If the provision is reactive, the Planning Commission has no affirmative duty to propose "reasonable changes" to help an applicant bring a site plan within what it perceives are the requirements of the Zoning Ordinance.[6]

 We believe that Section 6.08(2) is a proactive provision, in that it places on the Planning Commission the ultimate responsibility to determine the necessary requirements to render a proposed site plan acceptable under the Zoning Ordinance and then to inform the applicant of such required changes. Under this approach, the Planning Commission has an affirmative obligation in shaping the proposed site plan. Interpreting Section 6.08(2) otherwise would render this subsection of the Zoning Ordinance meaningless and inconsistent with basic concepts of zoning law and common sense. *Cf. First United Methodist Church of Hyattsville v. U.S. Gypsum*

---

**6.** Section 6.07 outlines the required information and review criteria for a site plan. Section 6.07(1) refers to a checklist of empirical information that needs to be included on a site plan. Section 6.07(2) provides the review criteria for the site plan process, in pertinent part:

Site plans shall be reviewed for compliance with provisions of this ordinance and with principles of good planning and design so as to further the intent and purpose of this Ordinance and to assure development which ... provides adequately for parking and for safe access to and from public streets and highways, which provides for safe and functional circulation of vehicular and pedestrian traffic....

*Co.,* 882 F.2d 862 (4th Cir.1989), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990) (stating that the most fundamental guide to statutory construction is common sense).

The Zoning Ordinance establishes the rules for interpreting its terms. Section 2.01 states, in part:

> The following rules of construction apply to the text of these regulations:
>
> (3) The words *shall* and *will* are always mandatory....
>
> (13) Throughout these Regulations, all words, other than the terms specifically defined above and below, have the meaning inferred from their context in these Regulations or the ordinary accepted definitions, as defined in the current edition of *Webster's Ninth New Collegiate Dictionary.*

Section 1.06 requires that "the terms of this Ordinance shall be applied to promote the intent as found in Section 1.03."[7] In the Zoning Ordinance, words are given their ordinary meanings in a way that furthers the Zoning Ordinance's purposes. This comports with Maryland law that states that words in statutes will be accorded their ordinary meanings where the words are unambiguous and consistent with the statute's apparent purpose. *Ayres v. Townsend,* 324 Md. 666, 672, 598 A.2d 470 (1991). Statutory language, however, must be read so as to advance the legislative policy behind the explicit language used. *Baltimore County Coalition Against Unfair Taxes v. Baltimore County,* 321 Md. 184, 203, 582 A.2d 510 (1990).

The proactive nature of Section 6.08(2) hinges on the two sentences that make up the section. These sentences cannot be read independently as if they were in a vacuum. Instead, Section 6.08(2) needs to be read as a whole and in the context

---

**7.** Section 1.03 states, in pertinent part:

> 1. These regulations are adopted with the intent that they will implement the policies of the Comprehensive Plan; will control congestion in the streets; will secure the public safety; will promote health and the general welfare....

of Section 6 of the Zoning Ordinance to gauge its proper meaning. *See Vest v. Giant Food Stores, Inc.*, 329 Md. 461, 466–67, 620 A.2d 340 (1993) (stating that in determining the meaning of a statutory provision, the statute must be examined as a whole).

The key term in the first sentence is the word "require." Webster's Ninth New Collegiate dictionary defines "require" as:

1a: to claim or ask for by right and authority . . . 2 a: to call for as suitable or appropriate b: to demand as necessary or essential: have a compelling need for 3: to impose a compulsion or command on: *COMPEL.*

Webster's Ninth New Collegiate Dictionary 1002 (1985) (emphasis added). The term "shall" makes it mandatory that the Planning Commission ascertain and require any reasonable changes that might bring a submission into compliance with the criteria of the Ordinance.

The second sentence of 6.08(2) helps flesh out the affirmative duty described in the first sentence. Section 6.08(2) provides, "If these [reasonable] changes are not made, the [Planning] Commission shall deny the application." The second sentence of 6.08(2) serves no purpose unless the Planning Commission has a duty to identify and propose "any reasonable changes." The applicant, however, cannot know what "reasonable changes" need to be incorporated unless the Planning Commission gives it specific guidance.

Under the reactive approach, the applicant would be required to guess what "reasonable changes" were necessary to gain approval. The site plan review process, as it was apparently intended to operate in the City of Frederick if the City's view prevailed, would have applicants coming back numerous times, proposing changes, and hoping it had captured in its resubmission what the Planning Commission expected to hear. An orderly process should not require an applicant to come back time and time again attempting to gain approval of a site plan only to have the Planning Commission reject the plan without telling the applicant how to satisfy the Zoning Ordi-

nance.[8] A random approach that requires applicants to guess what changes are required is not consistent with the legislative intent of the Zoning Ordinance or even common sense. *See State v. Thompson,* 332 Md. 1, 7, 629 A.2d 731 (1993) (stating that to determine a statute's meaning you need to look beyond the language, consider its purpose, and thus reach an interpretation that is compatible with common sense).

Under the reactive approach, the Planning Commission could deny an otherwise approvable site plan by simply not informing the applicant of what "reasonable changes" need to be incorporated to achieve approval. Thus, the reactive approach would result in granting the Planning Commission impermissively wide discretion to reject site plans. Such wide discretion runs counter to the power reserved for the Board of Aldermen in establishing zoning districts, in that the Planning Commission could determine what is a permitted use by rejection of a site plan.

■ The Planning Commission does not have the power to reject outright site plans that could be approved if "reasonable changes" were accepted by an applicant. Section 6.08(2) defines the Planning Commission's duties during the site plan approval process. Section 6.08(2) dictates that the Planning Commission's power lies in its being able to ensure that site plans meet the requirements outlined in Section 6.07(2). *See Friel v. Triangle Oil Co.,* 76 Md.App. 96, 109, 543 A.2d 863 (1988) (stating that, in reviewing a site plan, the Queen Anne's County Planning Commission could only consider factors outlined in the statute).

■ The Planning Commission's duties do not include reviewing the zoning classification decisions of the Board of Aldermen because the Board did not give the Planning Commission this power. *See Southland Corp. v. City of Laurel,* 75 Md.App. 375, 381–382, 541 A.2d 653 (1988) (the Laurel Plan-

---

8. Section 6.05(2) prohibits acceptance of a new site plan application until six months has elapsed since the denial of a prior application for "the same property and substantially the same development plan."

ning Commission had the right to consider "whether a proposed building or use, due to its proposed location, would create a public safety hazard"). Thus, because the Planning Commission does not have the express power to question the compatibility of the proposed use of a site already approved by the municipality's legislative body, it may reject a site plan in the very narrow situation where proposed "reasonable changes," where such exist, are not incorporated by the applicant. Once the Board of Aldermen approved the Sheetz site for general commercial development, it was presumed that the land could be used for building a convenience store with gas pumps.[9] *See Friel,* 76 Md.App. at 109, 543 A.2d 863 (stating that a zoning designation for a permitted use is "tantamount to a legislative finding that the use [is] in harmony with the general zoning plan") (quoting Rathkopf, *The Law of Zoning and Planning* § 62.03).

The proactive Zoning Ordinance is also consistent with the nature of site plan approval within general zoning law. Reviewing boards, such as the Planning Commission, ordinarily are required to approve site plans unless it is clear that they do not meet the objective requirements outlined in the zoning ordinance. Rathkopf, *supra,* at 62–4. This occurs because the legislative body has retained the power to define zoning districts.

The Planning Commission offers two arguments to explain away Sheetz's argument that it disregarded Section 6.08(2) in the case *sub judice.* First, the Planning Commission suggests that, because Sheetz did not provide impact reports for its newly proposed changes prior to or at the public hearing, it was the Planning Commission's duty to reject the site proposal. Thus, according to the Planning Commission, it may only consider proposed changes that are incorporated in the site

---

9. In reviewing a site plan, the Planning Commission has the right to consider, *inter alia,* the adequacy of public facilities that will serve the proposed development, and the impact on vehicular and pedestrian traffic from the development. Any site plan review, however, must be done in line with the presumption of acceptable use established by the legislature's zoning designation.

plan with specificity and accompanied by an updated analysis concerning the impact of such incorporated changes.[10] This argument illustrates, however, why the Planning Commission has a duty to recommend "reasonable changes."

The Planning Commission cannot use Sheetz's good faith effort to comply with the Zoning Ordinance against it. Sheetz proposed changes to its site plan in an attempt to appease the Planning Commission and conform its plan to the perceived problems that might otherwise lead to denial. Sheetz proffered that it would install a deceleration lane, contribute to the cost of acquiring a necessary right of way for a traffic signal, and, if necessary, to install a traffic signal at the intersection of Wilson Place and Rosemont Avenue. Instead of working with Sheetz, the Planning Commission simply ignored its proactive duty and rejected the plan.

Next, the Planning Commission insists the suggested changes "are beyond the realm of 'reasonable changes' contemplated by Section 6.08(2)." This argument misconstrues the basic procedure for a site plan approval. The Planning Commission has a duty to suggest any changes necessary to harmonize a site plan with the Zoning Ordinance. If the Planning Commission believes that it is impossible for the applicant to present a site plan that is within the requirements of the Zoning Ordinance, it may reject the plan, but only in exceptional circumstances and with cogent, adequately articulated reasons.

It does not matter if the Planning Commission believes the Sheetz plan is incompatible for that location. The Board of Aldermen designated the Sheetz site for general commercial development. Until this designation is changed, convenience stores, like the one proposed by Sheetz, are acceptable forms of development.

■ An issue remains about what constitutes "reasonable changes." For any proposal to constitute "reasonable

---

**10.** The record indicates that Sheetz supplied the Planning Commission with all the information that was required under Section 6.07(1).

changes," it needs to be presented in a fashion that unambiguously conveys to the applicant that the applicant has no choice but to include the proposed changes in the site plan, and if not, it will be rejected. General criticisms or suggestions, offered by the Planning Commission or Commission staffers previous to or during a public meeting, do not fulfill the obligation to propose "reasonable changes" under Section 6.08(2). To require otherwise would leave the applicant in a position of having to read the minds of the commissioners to gain approval of the site plan.

In this case, the Planning Commission never outlined what changes needed to be made to the Sheetz plan. Each commissioner expressed his or her own reason for disapproval of the Sheetz plan. Mr. Hudson expressed his reasons for moving to reject the plan. The Planning Commission voted unanimously to reject the Sheetz plan apparently based on what Mr. Hudson stated. None of the criticism and reservations expressed by the Planning Commission, however, can be considered "reasonable changes" under Section 6.08(2). They were reasons for rejecting the proposal and were not advice on how to bring the site plan within the scope of the Zoning Ordinance.

For the aforegoing reasons, we hold that the circuit court erred in affirming the decision of the Planning Commission. Because we reverse on this issue there is no need to address the remaining issues raised by Sheetz.

**JUDGMENT REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY WITH INSTRUCTIONS TO REMAND TO THE FREDERICK CITY PLANNING COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY THE APPELLEE.**

Concurring opinion by HARRELL, J.

HARRELL, Judge, concurring.

I write separately to express a supplemental and somewhat different path in reaching a similar result and to express another view of how the mandate should be construed. I consider Section 6.08(2) of the Zoning Ordinance to be a rather unusual provision among the zoning ordinances of the political subdivisions of Maryland with which I am familiar. The parties, unfortunately, have given us scant or no legislative history, or comparative analysis, regarding this section (perhaps because there is none). Nonetheless, I agree with the conclusion of my colleagues that, on its face, Section 6.08(2) appears to place an affirmative obligation upon the Planning Commission to identify and apprise an applicant for final site plan approval of "any reasonable changes" of which it can conceive that can be made to the submission in order to conform it to the review criteria of Section 6.07(2).

Unfortunately, the state of the record in this case does not permit me to conclude either that the Planning Commission failed in its duty to do that or that, assuming it did its duty, appellant rejected those "reasonable changes" and courted rejection. I explain.

Judge Fischer's opinion ably captures the various Commissioners' pre-rejection commentaries on the site plan. Prior to Commissioner Hudson's offer to appellant of a continuance to "massage" the submission and his subsequent motion to deny, however, it seems to me as well that the Commissioners were not proposing "reasonable changes" to Sheetz that appellant could make in its submission in order to achieve conformity with the review criteria. Rather, the portend of the Commissioners' collective remarks, as Judge Fischer observes, were that there may have been little that Sheetz could do to satisfy their concerns. By the same token, the Commissioners did not unequivocally state that there were no "reasonable changes" that they could articulate that would bring the site plan into compliance. Section 6.08(2) requires them to make that call, one way or the other, in a more clear and unambiguous institutional voice than is discernable from this record.

Having made that observation, however, if I were to construe what the Commissioners did say in critique of the site plan (whether as originally submitted or as offered by appellant in the course of the public hearing to be revised) as proffers of "reasonable changes" that Sheetz could accept or reject, I am unable to determine on this record if Sheetz rejected them. The response of Sheetz's counsel (Mr. Severn) to Commissioner Hudson's offer of a continuance to "massage" the application (obviously in light of the various preceding comments by the Planning Department and Commissioners) is reflected in the hearing transcript as "inaudible" for the most part. Commissioner Hudson's response to whatever it was that Mr. Severn did say gives rise to a reasonable inference that Sheetz rejected the opportunity to go back to the "drawing board" and implicitly also rejected any further changes to its submission in response to the Commissioners' concerns. It is not, however, the only reasonable inference drawable from the context.

I am less concerned than my colleagues that the site plan review process in Frederick City, in practice or as contemplated by the Zoning Ordinance, is as chaotic or happenchance as they paint it to be. An applicant is not necessarily compelled to be a fortune teller. It can submit a preliminary site plan under Section 6.06(3), in advance of a final site plan, in order to flush-out the Commission's "comments as to [the] acceptability" of the contemplated development scheme. Moreover, even if a final site plan is denied, an applicant can return with a new application, even one that proposes the same development scheme, six months after a prior denial.[1] Before Sheetz can compel us to reach the other issues raised in this appeal, or any future appeal, a better record must be made; one that clearly resolves whether the Commission's rejection of the instant application, or any future application, was based on

---

1. The Planning Commission denied Sheetz's plan at its 14 March 1994 meeting. Written notice of that action came in a 7 April 1994 letter to Sheetz's professional engineer. Sheetz could have re-applied almost three times in the time it has taken to get the instant case before this panel.

Sheetz's refusal to deal with any of the legitimate critiques of its submission put forth by the Commissioners at the 14 March 1994 hearing.

I agree with my colleagues that the Board can consider the adequacy of public facilities, such as road capacity, to serve the proposed development (4,000 square foot convenience store with 6 gas pumps and two vehicular ingress-egress points to public roads), the impact on safe access to and from public streets, and safe and functional circulation of vehicular and pedestrian traffic. Section 6.07(2), setting forth the site plan review criteria, provides:

> Site plans shall be reviewed for compliance with provisions or this ordinance and with principles of good planning and design so as to further the intent and purpose of this Ordinance and to assure development which is compatible with surrounding properties, which provides adequately for parking and *for safe access to and from public streets* and highways, *which provides for safe and functional circulation of vehicular and pedestrian traffic,* which provides for open space and parkland when required, which protects sensitive natural areas from development and minimizes natural hazards, *which will be adequately served by public facilities and services,* such as sewer water, streetlights, sidewalks, storm water management and/or storm drains, police, fire and refuse collection services, and which will not *be detrimental to the public health, safety or general welfare.* (emphasis supplied.).

Because appellant has provided us with no indication that adequacy of road capacity was addressed at the time its preliminary plan of subdivision was approved by the Commission in February 1993 (as would have been the case in many Maryland political subdivisions), I can conceive of no reason why Section 6.07(2) does not properly delegate to the Commission the right and the responsibility to take into account such impact from the specific development proposal in the site plan review process. Indeed, if such were not a proper concern at site plan review, why did appellant trouble itself to engage a

transportation planner/engineer to perform a study and give testimony? There was an abundance of evidence before the Commission concerning the current adequacy, or not, of the adjacent streets and critical intersections, as well as the status of planned public capital improvements that would affect those operating conditions. Moreover, there was considerable evidence as to traffic safety issues, as opposed to road volume and operational capacity issues, related to the proposed development's access points on the abutting roads. Thus, I cannot say from this record that the Commission denied the application because it determined there were no "reasonable changes" that could be made to the site plan that could bring it into compliance with the review criteria based on the facts as found to exist for purposes of the 14 March 1994 hearing, or whether it denied the application because Sheetz rejected any further revisions that would be responsive to the Board's articulated concerns.

Accordingly, in this rather unique case, I would vacate the circuit court's judgment and direct that it remand the case to the Planning Commission for further proceedings that would, at a minimum, answer cleanly the following questions:

1. Are there "any reasonable changes," within the meaning of Section 6.08(2) of the Zoning Ordinance, that Sheetz could make to its site plan that the Commission could identify with reasonable specificity which would bring the plan into compliance with the review criteria?

2. If so, what are those changes?

3. If so, will Sheetz accept those changes?

4. If not, what specific findings of fact and conclusions of law does the Commission make, related to the review criteria of Section 6.07(2), in support of denial of the application?

I would dispose of this appeal in this fashion in order to give the parties an opportunity to reconsider their positions in light of our interpretation of Section 6.08(2) and, if we are to address the other issues raised in this appeal, to do so on a record that involves no inappropriate guesswork on our part.