612 A.2d 574

**TRAILMOBILE, INC., Petitioner,**

**v.**

**STATE BOARD OF MANUFACTURERS, DEALERS AND SALESPERSONS, Respondent.**

**TRI–STATE TRAILER SALES, INC., Petitioner,**

**v.**

**STATE BOARD OF MANUFACTURERS, DEALERS AND SALESPERSONS, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 14, 1992.

Decided June 24, 1992.

John McN. Cramer, for petitioner Trailmobile, Inc.

Jan Ira Medoff, for petitioner Tri–State Trailer Sales, Inc.

Joyce McKeever, Chief Counsel, Bureau of Professional and Occupational Affairs, for respondent.

Before McGINLEY and KELLEY, JJ., and SILVESTRI, Senior Judge.

McGINLEY, Judge.

In this case, we are presented with two appeals from an order of the State Board of Manufacturers, Dealers and Salespersons (Board). We shall affirm the Board.

On May 24, 1985, trailer manufacturer Trailmobile, Inc. (Trailmobile) entered into a non-exclusive dealer agreement with Tri–State Trailer Sales, Inc. (Tri–State). The area covered by the agreement included specified counties of Pennsylvania, West Virginia and Ohio. Tri–State originally only sold Trailmobile trailers; however, in recent years it started selling several other brands. Tri–State was an award-winning Trail-

:

mobile dealer in 1989 and 1990. In May, 1990, Tri–State began to sell Stoughton brand trailers. Trailmobile's director of dealer sales, James Snyder (Snyder), informed Tri–State that if Tri–State continued selling the Stoughton line Trailmobile would enter into another dealer agreement. Frank Mancino (Mancino), president of Tri–State, refused to comply. Consequently, on December 12, 1990, Trailmobile entered into a dealer agreement with Luval/Reno's Trailer Sales (Reno's).

On June 25, 1991, Tri–State filed a complaint with the Board alleging violations of the Board of Vehicles Act (Act)[1] by Trailmobile, specifically unlawful coercion and entering into an improper dealership agreement with Reno's. The Board found that Trailmobile did attempt to coerce Tri–State in violation of the Act and imposed a $1,000 fine. The Board also found that Tri–State did not have standing under the Act to protest Trailmobile's dealership agreement with Reno's. Both Trailmobile and Tri–State filed appeals with this Court.

■ Trailmobile asserts that the Board incorrectly determined that Trailmobile attempted to "coerce" Tri–State into discontinuing a competitor's line in violation of Section 9(a)(6) of the Act.

Section 9(a)(6) of the Act, 63 P.S. § 818.9(a)(6), states that it is a violation of the Act for any manufacturer to "require, attempt to require, coerce or attempt to coerce" any new vehicle dealer in the state to refrain from investment in or acquisition of any other line of vehicle.[2] The Board found that Trailmobile violated Section 9(a)(6) when Snyder told Mancino that Trailmobile would sign another dealership contract with a nearby dealer unless Tri–State discontinued sales of Stoughton trailers.

1. Act of December 22, 1983, P.L. 306, *as amended,* 63 P.S. § 818.1–818.28.

2. A vehicle is defined under the Act as "every device which is or may be moved or drawn upon a highway, except devices designed primarily for use in construction or agriculture or road maintenance, devices moved by human or animal power, those used exclusively upon rails or tracks or motorized pedacycles." Section 2 of the Act, 63 P.S. § 818.2.

Trailmobile contends that the Board's definition of "coercion" is impractical insofar as it ignores Trailmobile's interest in assuring that the maximum effort is exerted to sell its trailers. Trailmobile also contends, and the Board found in its adjudication and order, that Tri–State's sales of Trailmobile trailers started to slip after Tri–State began to sell the Stoughton line.[3] Finally, it is Trailmobile's position that Tri–State should have been required to obtain a second line of credit when it began to sell Stoughton trailers, and consequently, Trailmobile's action was reasonable.

In refusing Trailmobile's argument, the Board was guided by *Berry Brothers Buick, Inc. v. General Motors Corporation, Buick Motors Division,* 257 F.Supp. 542 (E.D.Pa.1966), where the court interpreted a federal act's definition of "coercion" in the conduct of manufacturers toward dealers as including "a wrongful demand, which will result in sanctions if not complied with." The Board correctly concluded that Trailmobile attempted to coerce Tri–State to discontinue the Stoughton line by threatening to allow a nearby competitor to sell the Trailmobile line.

■ We also agree with the Board that Tri–State did not have to shoulder the burden of justifying its financial condition. Although Section 9(a)(6) provides that the section does not apply unless "the new vehicle dealer maintains a reasonable line of credit for each make or line of new vehicle ...", the section does not require proof from the dealer that an existing line of credit exists as a preliminary condition in every case. Trailmobile did not even allege, let alone present any evidence, before the Board that Tri–State lacked adequate credit. Consequently, Trailmobile cannot now raise this contention as a defense.

■ And we are not persuaded by Trailmobile's claim of business necessity to justify its actions. If Trailmobile feared that the addition of the Stoughton line at Tri–State would adversely impact on sales of its own trailers, it was perfectly

---

**3.** The Board also noted the general downturn in the economy during this time, however. Adjudication and Order of the Board, November 15, 1991, at 6, Reproduced Record (R.R.) at R–55.

free to enter into another dealership agreement for business reasons. However, Trailmobile violated the Act when Snyder threatened Tri–State's president in an attempt to force changes at Tri–State.

Tri–State appeals separately, challenging the order of the Board on three grounds. First, Tri–State contends that the Board erred by simply imposing a monetary fine on Trailmobile. Tri–State contends that the proper penalty, given the facts of this case and the clear and convincing evidence regarding coercion, is to order Reno's not to sell the Trailmobile Line or, in the alternative, to rescind Reno's contract to sell Trailmobile Products. In response, the Board argues that the relief Tri–State requests is not authorized by the Act.

The Act grants certain disciplinary powers to the Board. When the Board determines that a violation of the Act has been committed it may formally reprimand, suspend the license of, or refuse to issue or renew the license of the violator. Section 10 of the Act, 63 P.S. § 818.10. Additionally, Section 19 of the Act, 63 P.S. § 818.19, provides that the Board may levy a civil penalty of $1,000 upon any current licensee who violates a provision of the Act.

We reject Tri–State's request for additional relief because the Act is specific in its grant of power to the Board. We have already stated that the power and authority to be exercised by administrative commissions must be conferred clearly and unmistakably by the legislature; a doubtful power does not exist. *Pennsylvania Automotive Association v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 121 Pa.Commonwealth Ct. 352, 359, 550 A.2d 1041, 1045 (1988). Other than the temporary stay that may be issued in a suspected violation of Section 18 of the Act, 63 P.S. § 818.18, and the permanent injunction that may issue if the Board determines that there is good cause for not permitting the addition or relocation of a new vehicle dealer under Section 18, the Act does not grant the Board injunctive powers. *University Lincoln Mercury, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 133 Pa.Commonwealth Ct. 8, 17, 576 A.2d 1146, 1150 (1990). The fine imposed by the

Board based upon its finding of a violation of Section 9(a)(6) of the Act is an appropriate penalty.

 Secondly, Tri–State contends that the Board erred in determining that Tri–State did not have standing under Section 18 to contest Trailmobile's contract with Reno's because Tri–State and Reno's were not within the same relevant market area. Section 18 of the Act provides, in relevant part:

In the event that a manufacturer seeks to enter into a franchise establishing an additional new vehicle dealer within or into a relevant market area where the same line-make is then represented, the manufacturer shall in writing first notify the board and each new vehicle dealer in such line-make in the relevant market area of the intention to establish an additional dealer or to relocate an existing dealer within or into that market area. Within 20 days after the end of any appeal procedure provided by the manufacturer, any such new vehicle dealer may file with the board a protest to the establishing or relocating of the new vehicle dealer. When such protest is filed, the board shall inform the manufacturer that a timely protest has been filed, and that the manufacturer shall not establish or relocate the proposed new vehicle dealer until the board has held a hearing, nor hereafter, if the board has determined that there is good cause for not permitting the addition or relocation of such new vehicle dealer.

The Board found that Tri–State did not have standing to allege a violation of Section 18 of the Act, as Tri–State is located more than five miles from Reno's and is therefore outside the "relevant market area" as defined by the Act. Section 2 of the Act defines "relevant market area" as follows:

The area within a radius of 20 miles around an existing dealer or the area of responsibility defined in the franchise, whichever is greater; except that, where a manufacturer is seeking to establish an additional new vehicle dealer, the relevant market area shall be in all instances, except for cities of the first and second class which will be the area within a five-mile radius, the area within a radius of ten miles around the proposed site. Relevant market area shall

not apply to mobile home or recreational vehicle dealer or manufacturer agreements.

63 P.S. § 818.2. The Board found that Reno's was located at 3011 Smallman Street in Pittsburgh, a city of the second class, and more than five miles from Tri–State. Reno's is actually eight miles from Tri–State.

Tri–State argues that the Act directs relevant market area to be calculated using the radius around the *existing* dealer, citing *Walker Pontiac v. Bureau of Professional and Occupational Affairs*, 136 Pa.Commonwealth Ct. 54, 582 A.2d 410 (1990). Tri–State is located outside the city of Pittsburgh, and it contends that the ten-mile radius is applicable.[4]

Tri–State's reliance on our decision in *Walker Pontiac* is misplaced. In that case, an automobile dealer purchased a small Pontiac dealership intending to *relocate* it. Other automobile dealers, including Walker Pontiac, located in close proximity to the proposed site of the relocation, filed a protest with the Board. The Board interpreted "relevant market area" to be the area within a five mile radius of the "proposed site." This Court disagreed and remanded, holding that the "intent of the General Assembly [was] to protect the investment of an existing dealer and interests of consumers serviced by that dealer." *Walker*, 136 Pa.Commonwealth Ct. at 65, 582 A.2d at 416. We recognized also that the General Assembly specifically provided a method for determining the relevant market area for a new entry of a same line car dealer: "that the measurement was to be from 'the proposed site' of the new dealership." *Id.*

---

**4.** Tri–State also alleges that Reno's does business at a location one and a half miles from Tri–State by taking telephone orders from an office; therefore this location must be considered as within Tri–State's relevant market area. The Board's finding that Trailmobile did not authorize Reno's to sell and service Trailmobile vehicles at any location other than the Smallman Street location in Pittsburgh is supported by substantial evidence. Additionally Tri–State's flimsy attempt to establish that Reno's operates as a Trailmobile dealer in Carnegie, Pennsylvania, within Tri–State's relevant market area, did not include any evidence of actual telephone sales or solicitations and was appropriately rejected by the Board.

■ Finally, Tri–State contends that the definition of "relevant market area", should not apply in the realm of trailer sales. Section 18 provides that relevant market area is to be utilized in determining the geographic limits on establishing or relocating dealers generally, but includes several exceptions. Section 18(b)(4) exempts mobile home and recreational vehicle dealers. 63 P.S. § 818.18(b)(4). Additionally, the last sentence of the definition of relevant market area provides that "Relevant market area shall not apply to mobile home or recreational dealer or manufacturer agreements." 63 P.S. § 818.2. Tri–State alleges that trailer dealerships are so similar to mobile home and recreational vehicle dealers in franchising and availability that the concept and definition of "relevant market area" in the Act is inapplicable and non-controlling just as it is with mobile homes and recreational vehicles.

Unfortunately for Tri–State, the general provisions of the Act clearly apply because trailers are vehicles designed to be drawn upon our highways. While Tri–State contends that the "clear" legislative intent is that relevant market areas should not apply to trailer sales, what is clear from a reading of the statute is that the legislature chose to define "vehicle" broadly, with two specific exemptions from relevant market area for mobile home and recreational dealers and no others. Additionally, we note that the most logical reason relevant market areas do not apply to mobile home and recreational vehicle dealers is that these are the two devices exempted from Section 18's dealer relocation and establishment restrictions. Further, if these restrictions do not apply to trailer sales, Tri–State would have no conceivable basis for contesting Trailmobile's contract with Reno's.

The order of the Board is affirmed.

## ORDER

AND NOW, THIS 24TH DAY OF JUNE, 1992, the order of the State Board of Manufacturers, Dealers and Salespersons in the above-captioned matter is affirmed.