699 A.2d 1209

**ANTWERPEN DODGE, LTD., et al.,**

**v.**

**HERB GORDON AUTO WORLD, INC.**

**No. 156, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Sept. 8, 1997.

Price O. Gielen, Nathan D. Adler and Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, for appellant, Antwerpen.

Clyde H. Sorrell, Douglas R.M. Nazarian and Hogan & Hartson, L.L.P., Bethesda, Robert D. Cultice and Goldstein & Manello, P.C., Boston, Massachusetts, for appellants Chrysler Corp.

Peter H. Gunst and Weiner, Astrachan, Gunst, Hillman & Allen, P.C., Baltimore, for amicus curiae, the Maryland New Car and Truck Dealers Association.

Steven M. Nemeroff and Wortman & Nemeroff, P.A., College Park, for appellee.

Submitted before WENNER and EYLER, JJ., and ROBERT F. FISCHER, J. (Retired Specially Assigned).

EYLER, Judge.

This case is an interlocutory appeal from a denial of a motion to dissolve an interlocutory injunction[1] enjoining ap-

---

1. At the time the injunction was entered in 1996, former Rules BB72 through BB80 governed. Under the former rules, the types of injunctions issued by a trial court were referred to as *ex parte*, interlocutory, and final. Since adoption of Rules 15–501 through 15–505, effective January 1, 1997, the terminology has been changed. The types of

pellant Chrysler Corporation (Chrysler) from establishing or granting a new Dodge dealership in Clarksville, Maryland, and from negotiating with and making any commitments to appellant Antwerpen Dodge, Ltd. (Antwerpen Dodge) in connection therewith. Relying primarily upon Md.Code Ann., Transp. art. § 15–207 (1992 Repl.Vol., 1996 Supp.), the trial court held that appellee Herb Gordon Auto World, Inc. (Herb Gordon) had presented a justiciable issue regarding whether establishment of a Dodge dealership in Clarksville, eleven miles [2] from Herb Gordon's Dodge dealership, violates § 15–207, and that a preliminary injunction was necessary to preserve the status quo pending trial. Given that appellee did not meet the requisites for the grant of a preliminary injunction, we shall reverse the trial court's order.

### Facts

Herb Gordon is an automobile dealership operating from facilities located in the Montgomery Auto Sales Park in Silver Spring, Maryland. Although Herb Gordon's mailing address is Silver Spring, the parties acknowledge that the actual location of its Dodge dealership is Burtonsville. Herb Gordon is a substantial business enterprise selling and servicing hundreds of new and used vehicles annually from five facilities in Silver Spring. In addition to Dodge vehicles, Herb Gordon sells Oldsmobile, Nissan, Mercedes–Benz, and Volvo vehicles. In 1995 alone, Herb Gordon sold in excess of 1500 Dodge vehicles.

Herb Gordon has a Dodge Sales and Service Agreement with Chrysler, dated October 10, 1988 (Dealer Agreement). Under the Dealer Agreement, Herb Gordon is required to sell a minimum number of Dodge vehicles as set by Chrysler. The Dealer Agreement further grants Herb Gordon a nonexclusive right to purchase Dodge vehicles from Chrysler and

---

injunctions now available are the temporary restraining order, preliminary injunction, and permanent injunction.

**2.** The record indicates that the Clarksville location is eleven road miles and seven air miles from Herb Gordon's dealership in Burtonsville.

to sell them at retail in a territory known as its "Sales Locality." The Dealer Agreement provides that Gordon's Sales Locality may be shared with other Chrysler dealers as Chrysler determines to be appropriate.

Herb Gordon's Sales Locality is described in an addendum to the Dealer Agreement entitled "Notice of Sales Locality Description." It lists approximately 55 cities and towns, not including Clarksville, Maryland. Although Dodge dealers, including Herb Gordon, are free to sell Dodge vehicles outside their designated Sales Localities, the Notice of Sales Locality provides as follows:

The above Sales Locality is hereby designated as the territory of DEALER's responsibility for the sale of [Chrysler] vehicles, vehicle parts and accessories therefor, and will be used by [Chrysler] to determine DEALER's Minimum Sales Responsibility (MSR) and to measure DEALER's sales performance in relation to such MSR, and to evaluate DEALER's performance pertaining to other matters relating to DEALER's operations.

Herb Gordon has enjoyed great success as a Dodge dealership and, over the years, has been the recipient of a number of awards from Chrysler for outstanding sales and customer service. Chrysler recognized Herb Gordon as the seventh largest Dodge sales dealership in the nation for the calendar year 1991. Until 1992, Herb Gordon was consistently the second highest volume seller of Dodge vehicles in the Washington Zone until he became the highest volume seller in 1992 and 1993.

Appellant Antwerpen Dodge also has been a successful Dodge dealer. In January 1994, Jack Antwerpen, principal of Antwerpen Dodge, entered into a buy/sell agreement with the owner of a failing Dodge dealership in Randallstown, Maryland and ultimately transformed it into a successful operation. In 1993, the Randallstown dealership sold only 172 Dodge vehicles, but in 1995 Antwerpen Dodge sold 802 vehicles at that location. Prior to Antwerpen Dodge's purchase of the Randallstown location, Chrysler made the location available to

Antwerpen Dodge, Herb Gordon, and others, and informed them that, if the opportunity arose, it was Chrysler's plan eventually to relocate the Randallstown dealership to Clarksville.

Very soon after Antwerpen Dodge entered into the buy/sell agreement for the Randallstown dealership, and prior to Chrysler's official approval of the sale, Chrysler began informing Herb Gordon that it intended to support a move of Antwerpen Dodge's dealership from Randallstown to Clarksville once Chrysler determined that the Clarksville market was ready. From the very beginning, Herb Gordon expressed its opposition to such a move and indicated that if a new dealership were established in Clarksville, it should be awarded to Herb Gordon. Herb Gordon informed Chrysler that Clarksville constituted a significant portion of its market and that additional competition there would threaten its business.

Herb Gordon alleges that, at a meeting between it and Chrysler in January 1994, Chrysler informed Herb Gordon that it "would not establish a Dodge dealership in another dealer's market area, if the conditions did not warrant it, or it was detrimental to the existing Dodge dealer." Herb Gordon further alleges that, in May or early June, 1994, a Chrysler official, William Glaub, informed Herb Gordon that "Dodge in Columbia[3] is dead." Mr. Glaub denies that he ever told Herb Gordon that the Columbia location was forever dead. Mr. Glaub does admit to having informed Herb Gordon, in or about February 1994, that Chrysler was prepared to delay establishment of a dealership in Clarksville for one year.

Herb Gordon alleges that, based in part upon Chrysler's representation that "Dodge in Columbia is dead," Herb Gordon invested $750,000 to improve its facilities. Chrysler points out that the improvements to the facilities were necessary to accommodate Herb Gordon's then existing business,

---

**3.** While the parties agree that the official location of the proposed Dodge dealership site is Clarksville, over the years they have alternately referred to the location as Clarksville, Columbia, or Clarksville/Columbia.

and that Herb Gordon had retained an architect in 1993, prior to the alleged representation. Chrysler further notes that the expenditures were made by a separate corporate entity rather than by Herb Gordon, and that Herb Gordon already has realized $500,000 in additional net profits as a result of the increase of service bays.

In July 1995, Chrysler approved the establishment of a Dodge dealership in Clarksville and prepared a Letter of Intent to be issued to Antwerpen Dodge. Upon learning of the approval, Herb Gordon requested a meeting with Chrysler and a meeting was held on September 11, 1995. At that meeting, Chrysler informed Herb Gordon that it would not proceed with establishment of a dealership in Clarksville for another one year period, and after a year, it would review the market data for the area and decide whether or not to proceed with Dodge representation.

In a letter to Antwerpen Dodge, dated March 17, 1996, Chrysler informed Antwerpen Dodge that it planned to appoint a Dodge dealer in Clarksville after September 17, 1996, and that, assuming it meets all of Chrysler's criteria regarding capital, facilities, and management, Antwerpen Dodge would be the dealer in Clarksville. The letter further informed Antwerpen Dodge that "should circumstances beyond Chrysler's control, including State RMA [Relevant Market Area] legislation or litigation brought on by a third part[y], prevent the appointment of a Dodge dealer in Clarksville, the construction of a new facility prior to September 17, 1996, is done at your own risk." Jack Antwerpen, through another corporate entity, Antoy Limited Liability Company, began construction of a Dodge dealership and an adjoining Toyota dealership in Clarksville in June, 1996.

On July 15, 1996, Herb Gordon filed, in the Circuit Court for Montgomery County, a verified complaint for injunctive and other relief against Chrysler based on breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, deceit, negligent misrepresentation, promissory estoppel, negligence, and violation of the Maryland

Dealer's Act. Along with the complaint, Herb Gordon filed, pursuant to former Rule BB72, a motion for ex parte, interlocutory, and permanent injunctions. In support of its motion, Herb Gordon alleged that establishment of a Dodge dealership in Clarksville would result in a loss of 43% of its business and, ultimately, the likely "ruination" of its business. On the date suit was filed, the trial court entered an order granting an ex parte injunction enjoining Chrysler from "establishing or granting a new Dodge motor vehicle dealership in the Clarksville, Maryland area and from negotiating and making any commitments with Antwerpen Dodge in connection therewith." Thereafter, Chrysler filed a motion to dismiss and an opposition to Herb Gordon's motion for interlocutory injunction. After a hearing, the trial court denied Chrysler's motion and upheld its prior ordering granting injunctive relief. In continuing the injunction, the trial court apparently accepted Herb Gordon's representation that it would permanently lose 43% of its business if the injunction were not granted. Further, although Antwerpen Dodge was not a party at the time, the trial court considered the potential impact of an injunction upon Antwerpen. With respect to such impact, the court stated as follows:

> Well, let me just say this with all due deference. It seems to me that if he's [Jack Antwerpen] got the place up in Randallstown and he's got the Toyota business in Clarksville, that the cry of irreparable harm to him tends to, in my view, fall on deaf ears.
>
> And so I am not—I simply am not going to withdraw the—I am denying the motion to set aside the injunction at this time.

Citing to a lack of evidence that Chrysler was losing any sales as a result of the injunction, the trial court further denied Chrysler's request for a bond based on a finding that Chrysler was not suffering any harm.

Thereafter, Antwerpen Dodge was permitted to intervene. On January 10, 1997, Antwerpen Dodge filed a motion to dissolve the injunction or, alternatively, to require Herb Gordon to post a bond. On February 20, 1997, the trial court

conducted a hearing on Antwerpen Dodge's motion and denied the motion. In support of its motion, Antwerpen Dodge cited evidence that, but for the injunction, it would be awarded a Dodge dealership in Clarksville, evidence that construction of the Dodge facility was expected to be completed by late March or early April, and evidence that Antwerpen Dodge had hired personnel and was required to begin stocking the facility 30 days prior to opening. Antwerpen Dodge further argued that, to the extent Herb Gordon does lose business as a result of the new Dodge dealership, he has a significant sales history that can be used as the basis to calculate damages. By contrast, Antwerpen Dodge has no sales history for a Dodge dealership in Clarksville. The trial court remained unpersuaded that Antwerpen Dodge would suffer any harm as a result of the injunction:

THE COURT: Mr. Antwerpen is not going to the poor house in connection with this matter. I mean, he has and is about to open, apparently, a good size Toyota dealership right there.

[COUNSEL FOR ANTWERPEN DODGE]: He is just relocating his Toyota dealership.

THE COURT: Well, whatever. I mean, but nonetheless—I mean, he didn't do it because he thought that he was going to make less money there, did he?

[COUNSEL FOR ANTWERPEN DODGE]: Absolutely not.

THE COURT: He thought he was going to make more money there.

[COUNSEL FOR ANTWERPEN DODGE]: Your Honor, it is two buildings.

THE COURT: All right.

[COUNSEL FOR ANTWERPEN DODGE]: They have a wall between them. One is for Toyota and one is for Dodge.

THE COURT: Okay. But the fact is that he will be making money on this—hopefully, and I hope he—I genuinely hope he does—

\* \* \* \*

THE COURT: No, I am denying that [request for bond], because at this stage—nothing has occurred. There hasn't been, as far as I can see, a dime lost by Antwerpen with regard to any of this. If in fact it comes to pass that there is—that it genuinely is occurring, that the party who is genuinely in this case is in fact at least arguably losing money, then you can revisit that issue, but not now.

In denying Antwerpen Dodge's motion, the trial court focused primarily on Herb Gordon's argument that § 15–207 prohibited Chrysler from granting the Dodge dealership to Antwerpen:

Gentlemen, on these issues I have heard enough. You are both going to go away with something and you both are not going to go away with something.

I am not convinced that I know why this—I simply don't know why this event occurred. Chrysler and Antwerpen say that Gordon is just simply pernicious and that he just is stamping his foot; on the other hand, Gordon says, "Well, I can prove, if I ever get in front of a trier of fact, that I am— that this is going to materially affect my ability to do business," and I don't pretend at this stage to be able to divine who has it right.

The question is whether or not there is a valid issue regarding these various arguments, and I think there is. I think it is something that has to be determined by a trier of fact.

I will accept that 15–207d or 15–207 in general applies to this situation, having heard nothing to the contrary with regard to it; notwithstanding that this lawsuit was filed before the enacting of this statute.

Further, the legislature did not say, as defendant—at least defendant Chrysler, and joined by others—did not say that this is simply that the manufacturer, distributor, et cetera, may not coerce a dealer; they didn't leave it at that,

they put in another word, "require," and that require then is followed by what?—"Require them to materially change the dealer's facilities or method of conducting business if the change would impose substantial financial hardship on the business of the dealer."

\* \* \* \*

But, in my view, 15–207 does apply, and the question is what has happened here with regard to what Chrysler has done, along with Antwerpen. It is a justiciable issue, and I am going to deny the motion to dissolve the injunction, because I think that if I were—no one addressed themselves to the analogy[4] that I put forward and I think it is fairly apt, and that once the edifice is done, once the dealership is an ongoing thing, it will be a total nightmare to try to undo that scenario, and be overwhelmingly financially detrimental to all sides. So, it seems to me that the better methodology is to continue the injunction until we can have this matter judged on the merits.

The trial court thereafter issued a written order and Antwerpen Dodge and Chrysler appealed.

### Questions Presented

The parties present essentially four questions on appeal which we slightly rephrase for clarity:

1. Did the trial court err as a matter of law in determining that the potential for irreparable harm to Herb Gordon outweighed the harm that would result to Antwerpen Dodge by virtue of the continuation of the preliminary injunction?

2. Did the trial court err as a matter of law by interpreting Md.Trans. § 15–207(d)(2) to provide Herb Gordon with

---

4. The trial judge asked the parties whether he would be requiring them to step out of the way if he set an old M–1 on a tripod, aimed, and told them he was going to "crank off a round."

a basis for preventing Chrysler from establishing a Dodge dealership in Clarksville, Maryland?

3. Did the trial court err as a matter of law by giving § 15–207(d) retroactive effect? [5]

4. Did the trial court abuse its discretion in refusing to condition the preliminary injunction upon the posting of a bond?

### *Standard of Review*

■■■■ While the grant or denial of an interlocutory injunction is a matter within the sound discretion of the trial court, such " 'discretion must be exercised by the [trial judge] upon a consideration of all the circumstances of the case.' " *Lerner v. Lerner,* 306 Md. 771, 776, 511 A.2d 501 (1986) (quoting *State Department of Health and Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51 (1977)). Further, the proper exercise of discretion requires the trial court to consider four factors: "(1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result [to the plaintiff] from its refusal; [footnote omitted] (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest." *Department of Transportation v. Armacost,* 299 Md. 392, 474 A.2d 191 (1984). *See also Fogle v. H & G Restaurant,* 337 Md. 441, 455–56, 654 A.2d 449 (1995); *Lerner,* 306 Md. at 776, 511 A.2d 501 (quoting *State Department of Health and Mental Hygiene,* 281 Md. at 554, 383 A.2d 51). Consideration of irreparable injury to the plaintiff can include the necessity to maintain the status quo pending litigation. *Lerner,* 306 Md. at 776, 511 A.2d 501 (quoting *State Department of Health and Mental Hygiene,* 281 Md. at 554, 383 A.2d 51).

---

**5.** Section 15–207(d) was enacted in 1996, effective October 1, 1996. Herb Gordon filed suit and obtained an ex parte injunction on July 15, 1996. Appellants argue that application of § 15–207(d) to the instant dispute is a retroactive application of the statute.

■ Quoting favorably from a Fourth Circuit opinion, the Court of Appeals set forth the appropriate analysis in *Lerner*, 306 Md. at 783–85, 511 A.2d 501 (quoting *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 194–96 (4th Cir.1977)). A review of that discussion reveals that, of the four factors to be considered by the trial court, the balance of hardships is the most important. The trial court must first

> balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:

>> [I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.

*Id.* at 783–84, 511 A.2d 501 (quoting *Blackwelder*, 550 F.2d at 194–96, quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir.1953)). "The importance of probability of success increases as the probability of irreparable injury diminishes [citations omitted]; and where the latter may be characterized as simply 'possible,' the former can be decisive. Even so, it remains merely one 'strong factor' to be weighed alongside both the likely harm to the defendant and the public interest." *Id.* at 784, 511 A.2d 501 (quoting *Blackwelder*, 550 F.2d at 194–96). Further, the trial court must also be mindful of the balance-of-hardship test as it evaluates the requirement of irreparable harm to the plaintiff. *Id.*

> [W]hile "irreparability" may suggest some minimum of probable injury which is required to get the court's attention, the more important question is the relative quantum and quality of plaintiff's likely harm. The decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant. If it costs very little, the trial court should be more apt to decide that the threatened injury is "irrepara-

ble" for the purposes of interlocutory relief. In addition, as we have noted above, even a "possible" irreparable injury has been held to suffice if there is strong probability of success on the merits.

*Id.* at 784–85, 511 A.2d 501 (quoting *Blackwelder,* 550 F.2d at 194–96) (emphasis in original).[6]

Keeping the foregoing framework in mind, we now turn to the issues raised on appeal. Ordinarily, we will not disturb a preliminary injunction on appeal absent an abuse of discretion, *Maryland Com'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 521, 678 A.2d 55 (1996). Appellants contend that the trial court's ultimate decision rested upon certain errors of law. If that is the case, we must merely determine whether the trial court's rulings on the law were legally correct. *See Id.* (quoting *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993)) ("[E]ven with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards.").

--------

**6.** More recently, the Court of Appeals has stressed that the party seeking the injunction must prove the existence of all four factors; thus, the failure to prove the existence of even one of the four factors will preclude the grant of preliminary relief. *Fogle,* 337 Md. at 456, 654 A.2d 449. Without discussing any of the other factors, the Court in *Fogle* vacated the preliminary injunction solely on the basis that the plaintiffs had little likelihood of succeeding on the merits. We do not view *Fogle* and *State Dep't,* the authority cited in *Fogle,* to be at odds with *Lerner* because *Lerner* involved only private interests while *Fogle* and *State Dep't* both involved government entities. As the Court of Appeals noted in *State Dep't,* the balance of hardships factor normally will not be considered in a dispute between two governmental parties. *State Dep't,* 281 Md. at 557, 383 A.2d 51. *See also Armacost,* 299 Md. at 404–05 n. 6, 474 A.2d 191. While *Fogle* did not involve a dispute between two governmental entities, it did involve private party plaintiffs who were seeking to enjoin a government entity. With regard to the case before it, the *Fogle* Court noted that "in cases in which injunctive relief directly impacts governmental interests, 'the court is not bound by the strict requirements of traditional equity as developed in private litigation.'" *Fogle,* 337 Md. at 456, 654 A.2d 449 (quoting *State Dep't,* 281 Md. at 555, 383 A.2d 51). Accordingly, notwithstanding the discussions in *Fogle, State Dep't,* and *Armacost,* we view the *Lerner* framework to be the controlling one in cases involving only private parties.

*Discussion*

A.

## Balance of Hardships

██ It was Herb Gordon's burden to prove the facts necessary to satisfy the requisite factors for imposition of the injunction. *Fogle,* 337 Md. at 456, 654 A.2d 449. Our review of the record reveals that it failed to meet its burden.

The trial court apparently accepted at face value Herb Gordon's representation that it likely would lose 43% of its business if an injunction were not granted. Herb Gordon did not provide or proffer any evidence in support of its contention that the market in question is insufficient to support an additional Dodge dealer. Herb Gordon did not offer even anecdotal evidence in support of its assertion that establishment of a Dodge dealer in Clarksville will result in a loss of all of the business that Herb Gordon currently derives from that area. Herb Gordon's essential premise is that consumers will not travel beyond their immediate environs in order to purchase a vehicle. The trial court accepted this premise even though the record demonstrated that Herb Gordon sold vehicles to customers living in areas outside of Burtonsville, and sold vehicles to customers living in areas where other Dodge dealers are located.

Even if we presume that Herb Gordon's assertion is correct, its representation that it derives 43% of its business from the Clarksville area is overstated. The 43% figure was derived from information provided by Chrysler to Herb Gordon and includes sales in Burtonsville, the site of Herb Gordon's dealership, Laurel, an area that is the site of another Dodge dealership, and Clarksville. More specifically, Chrysler's compilation of Herb Gordon's sales figures for 1994 reveal that, in 1994, Herb Gordon derived 21.3% of its sales from Burtonsville, 11.39% of its sales from Laurel, and only 10.82% of its sales from Clarksville. Thus, the evidence does not support the finding that Herb Gordon is likely to lose 43% of its business.

■ The trial court further determined that Antwerpen Dodge would not suffer any harm as a result of the injunction. There is absolutely no support in the record for that determination. Although it is true that officially Chrysler has not yet granted a Dodge dealership in Clarksville to Antwerpen Dodge, the record is clear that the only thing preventing the official grant of the dealership is the preliminary injunction. Indeed, were this not the case, a preliminary injunction would be unnecessary. While the injunction is in place, Antwerpen Dodge will be prevented from selling *any* Dodge vehicles from its location in Clarksville. While Herb Gordon *possibly* will lose a *portion* of its business if the injunction is not in place, Antwerpen Dodge is *certain* to lose *all* of its business with the injunction in place. It is completely irrelevant that Antwerpen Dodge derives revenues from other distinct businesses such as its Dodge dealership in Randallstown or its Toyota dealership in Clarksville.[7] It is the Dodge dealership in Clarksville that is at issue in this case, and it is that business that is wholly prevented by the preliminary injunction.

Further, as Antwerpen Dodge points out, Herb Gordon has a sales history against which to measure damages in the event that it loses business to the new Clarksville dealership. By contrast, the Clarksville dealership has no sales history, making it potentially very difficult, if not impossible, to assess Antwerpen Dodge's damages. Given the foregoing, the balance tips decidedly in favor of Antwerpen Dodge.

■ Herb Gordon contends that any potential harm to Antwerpen Dodge cannot be considered because Antwerpen Dodge has no legally protectable interest. More specifically,

---

7. We note that there is no indication that Antwerpen Dodge, the party in this case, operates or derives any revenue from the Toyota dealership in Clarksville. Instead, that dealership apparently is operated by Jack Antwerpen through the separate corporate entity of Antoy LLC. We find it puzzling that the trial judge admonished the parties to maintain the technical distinctions between various corporate entities operated by the respective principals, yet blurred those corporate lines when he noted that Antwerpen "will not go to the poor house" because he can sell Toyotas from Clarksville.

Herb Gordon maintains that Antwerpen Dodge does not have a contract with Chrysler. While it is true that Antwerpen Dodge and Chrysler do not have a Dealer Agreement for the Clarksville location, Chrysler informed Antwerpen Dodge on a number of occasions that it intended to award the Clarksville dealership to it if it met Chrysler's requirements regarding capital, facilities, and management. Antwerpen Dodge contends that it has met all of Chrysler's requirements and no other party contends otherwise. Indeed, Herb Gordon's assertion that there is no contract between Antwerpen Dodge and Chrysler is at odds with its assertion that it will suffer immediate and irreparable harm in the event the injunction is not upheld.

■ Notwithstanding the foregoing, there arguably was a basis for granting the injunction if Herb Gordon demonstrated a strong likelihood of entitlement to a permanent injunction after a trial on the merits. The establishment of a new dealership in Clarksville, prior to a determination on the merits, may compromise the trial court's ability to fashion injunctive relief at a later date. This is exactly the situation that the trial court seemed to want to avoid. We agree that maintenance of the status quo, in order to prevent the ultimate frustration of a litigant's claim, is a permissible goal of preliminary injunctions. *See Lerner,* 306 Md. at 791, 511 A.2d 501 (quoting *State Dep't, supra,* 281 Md. at 559, 383 A.2d 51 quoting 43 C.J.S. *Injunctions* § 17, at 427) ("court will grant preliminary injunction when one of the parties is committing an act 'that will cause irreparable injury *or* destroy the status quo of the controversy before a full hearing can be had....'") (emphasis in original) *General Motors Corp. v. Miller Buick, Inc.,* 56 Md.App. 374, 386, 467 A.2d 1064 (1983) (quoting *Musgrave v. Staylor, Admr.,* 36 Md. 123, 128 (1872)) (noting that the purpose of an interlocutory injunction is to "prevent a disposition 'which would defeat or embarrass the passage of a final decree under which the complainant's rights could be effectively secured and enforced.'"). As demonstrated below, however, there is little likelihood that Herb Gordon will be

entitled to a permanent injunction.[8] Accordingly, maintenance of the status quo in this case is unnecessary.

## B.

## Likelihood of Success

### 1. Section 15–207

■ Herb Gordon contends that Chrysler's establishment of a Dodge dealership in Clarksville violates § 15–207(d)(2) of the Transportation Code, and that it ultimately will be entitled to enjoin such a violation. The problem with Herb Gordon's contention is that it has not adequately alleged a violation of § 15–207(d)(2) or, for that matter, any portion of Subtitle 15.

Section 15–207(d)(2) of the Transportation article provides as follows:

(d) *Franchise agreements.*—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not require or coerce a dealer, by franchise agreement or otherwise, or as a condition to the renewal or continuation of a franchise agreement, to:

\* \* \* \*

(2) Materially change the dealer's facilities or method of conducting business if the change would impose substantial financial hardship on the business of the dealer.

Herb Gordon contends that § 15–207(d)(2) prohibits a manufacturer from establishing a new dealership in proximity to an existing dealership if the new dealership will damage the existing dealer's business. Relying on a few key phrases in § 15–207, Herb Gordon claims that increased competition caused by establishment of a Dodge dealership in Clarksville will "require" Herb Gordon to "materially change [its] ... methods of conducting business" in a manner that will impose

---

8. We express no opinion on the viability of Herb Gordon's action for damages under the various theories contained in the complaint.

"substantial hardship" on its business. By contrast, Antwerpen Dodge and Chrysler maintain that a requisite of § 15–207(d)(2) is some form of a demand, threat, or coercion by the manufacturer. Section 15–207(d)(2), they argue, does not address the situation in which the actions of the manufacturer unintentionally and indirectly cause a dealer to change materially its methods of conducting business. We agree with appellants' interpretation.

Section 15–207 defines "coerce" as follows:

"Coerce" means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences.

§ 15–207(a)(1).

While there are no Maryland cases that discuss application of the term "coerce" as used in § 15–207, we find the definition to be unambiguous. In order for coercion to exist within the meaning of this definition, the manufacturer must specifically undertake to change the dealer's conduct. This concept of coercion is similar to that utilized in the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.* (Federal Dealers' Act). Specifically, the concept of coercion requires, at the very least, a demand by a manufacturer that is accompanied by a threat of sanctions for noncompliance.[9] *See Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 795–96 (7th Cir.1989); *Dreiling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1378 (10th Cir.1988) (quoting *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685

---

**9.** The federal cases interpreting the Federal Dealers' Act require more specifically that the demand be wrongful in order for the dealer to establish a violation of the Act. "[T]he dealer must demonstrate that the manufacturer exercised coercion or intimidation or made threats against the dealer [citations omitted] to achieve an improper or wrongful objective." *Empire Volkswagen,* 814 F.2d at 95. " '[M]ore is required than coercion and subsequent termination for failure to submit, for otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions.' " *Id.* (quoting *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 561 (2nd Cir.1970)). We need not determine whether the Maryland Act similarly requires that the manufacturer's objectives be improper or wrongful as it is undisputed that no demand, wrongful or otherwise, was made by Chrysler in this case.

(6th Cir.1976)); *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.*, 814 F.2d 90, 95–96 (2nd Cir.1987); *R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.*, 807 F.2d 1222, 1227 (5th Cir.), *cert. denied*, 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1056 (1st Cir.1985); *American Motors Sales Corp. v. Runke*, 708 F.2d 202, 206–07 (6th Cir.1983); *Francis Chevrolet Co. v. General Motors Corp.*, 602 F.2d 227, 229 (8th Cir.1979); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978).

■ By contrast, the term "require" is not defined by § 15–207. In the absence of a statutory definition, we must give the term "require" its plain and ordinary meaning. *Chesapeake and Potomac Telephone Co. v. Director of Finance, City Council of Baltimore*, 343 Md. 567, 578, 683 A.2d 512 (1996); *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995). We recently noted the dictionary definition of the term "require" as follows:

"1a: to claim or ask for by right and authority[;] . . . 2a: to call for as suitable or appropriate[;] b: to demand as necessary or essential[;] have a compelling need for 3: to impose a compulsion or command on[;] COMPEL."

*Sheetz, Inc. v. Frederick Planning Com'n*, 106 Md.App. 531, 542, 665 A.2d 327 (1995), *cert. denied*, 341 Md. 405, 671 A.2d 20 (1996) (quoting Webster's New Ninth Collegiate Dictionary 1002 (1985)) (emphasis supplied by Court). The ordinary and plain meaning of "require" embodies the notion of demand or compulsion similar to that embodied in the term "coerce." It is undisputed that Chrysler has not made any demand of Herb Gordon; Chrysler has not attempted to compel Herb Gordon to do anything.

■ Notwithstanding the plain language of § 15–207(d)(2), Herb Gordon cites to some legislative history in support of its interpretation. In particular, Herb Gordon quotes a statement of Senator Phillip C. Jimeno dated February 21, 1996:

The purpose of this proposal is to strengthen Maryland's existing laws to afford additional protection to more than 350 new car and truck dealers operating in our state.

This additional protection is essential in light of what is happening in the industry. Manufacturers are evaluating and changing the dealer network system throughout the United States. This includes reducing the number of auto dealerships in the country; relocating many others and redesigning and renovating facilities. These initiatives may very well threaten the existence of certain Maryland auto dealers.

The provisions of Md.Ann.Code § 15–207(d)(2) will provide reasonable guidelines and safeguards for auto and truck dealers in the continuing relationship with the manufacturer.

■ We note, first, that this statement is general and does not indicate that the purpose of the legislation is to give dealers the precise protections argued by Herb Gordon. Further, while we often will look to legislative history to aid us in interpreting statutes, such history does not override express statutory language. *In re Douglas P.,* 333 Md. 387, 392, 635 A.2d 427 (1994); *State v. Patrick A.,* 312 Md. 482, 540 A.2d 810 (1988); *Department of Economic and Employment Development v. Taylor,* 108 Md.App. 250, 267, 671 A.2d 523, *aff'd,* 344 Md. 687, 690 A.2d 508 (1997).[10] In any event, contrary to Herb Gordon's assertion, the legislative history does not reveal an intent at odds with the plain language of the statute. We explain.

■ The type of protection Herb Gordon argues is available to it under § 15–207 is provided in the Relevant Market

---

**10.** Similarly, we do not find the affidavit of Joseph P. Carroll, President of the Maryland New Car and Truck Dealers Association, to be persuasive evidence of legislative intent. Although Mr. Carroll's affidavit indicates that the Association assisted in the drafting of the legislation, his affidavit merely states the Association's opinion of how the statute should be interpreted.

Area (RMA) statutes of several states.[11] Generally, such statutes prohibit manufacturers from establishing another like-line dealer in an existing dealer's relevant market area without notice and good cause. *Monmouth Chrysler–Plymouth, Inc. v. Chrysler Corp.*, 102 N.J. 485, 509 A.2d 161, 163 n. 2 (1986). *See, e.g., In re Kerry Ford, Inc.*, 106 Ohio App.3d 643, 666 N.E.2d 1157, 1159 (10 Dist. 1995); *Northwest Datsun v. Oklahoma Motor Vehicle Com'n*, 736 P.2d 516, 518 (Okl. 1987); *Trailmobile v. State Bd. of Mfrs.*, 148 Pa.Cmwlth. 600, 612 A.2d 574, 576–77 (1992), *appeal denied*, 535 Pa. 664, 634 A.2d 226 (1993). *See also, e.g., Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 381 N.E.2d 908, 911 (1978) (requires consideration of adequacy of servicing of area by existing dealers); *General Motors Corp. v. Capitol Chevrolet*, 645 S.W.2d 230, 234 (Tenn.1983) (same); *Courtesy Motors, Inc. v. Ford Motor Co.*, 9 Va.App. 102, 384 S.E.2d 118, 119–20 (1989) (manufacturer must establish that market will support both existing and additional dealers). Such statutes define "relevant market area" and many use a mileage radius in their definitions. *See, e.g., Tober Foreign Motors*, 381 N.E.2d at 911 (uses equitable principles to define relevant market area); *Northwest Datsun*, 736 P.2d at 518 (mileage radius); *Trailmobile*, 612 A.2d at 577 (mileage radius); *Capitol Chevrolet*, 645 S.W.2d at 234 (uses definition provided in franchise agreement).

In 1989 and 1990, RMA legislation proposed by the Maryland New Car and Truck Dealers Association (Association) was pending in the Maryland House of Delegates as House Bills 1375 and 421 respectively. Ultimately, the proposals were withdrawn by the Association because of disagreement within the Association regarding sponsorship of the bills. These proposals defined "relevant market area" using a mileage radius, provided for written notice to existing dealers of a manufacturer's intention to add an additional dealer or relocate an existing dealer of the same line make within the

---

11. *See Monmouth Chrysler–Plymouth, Inc. v. Chrysler Corp.*, 102 N.J. 485, 509 A.2d 161, 163 n. 2 (1986) (listing 22 state RMA statutes).

existing dealers' relevant market area, established procedures by which an existing dealer may protest relocation or establishment of a new dealer, and provided criteria for the determination of whether good cause exists for relocation or establishment of a new dealer. Section 15–207 does none of these things. Section 15–207 is not, as Herb Gordon contends, an RMA statute that gives Herb Gordon the right to challenge Chrysler's establishment of a new dealer in proximity to Herb Gordon. *See In re Kerry Ford, Inc.*, 666 N.E.2d at 1161–62 (comparing and contrasting dealers act that prohibits coercion with RMA legislation).

Given that § 15–207 does not provide a basis for injunctive relief on behalf of Herb Gordon, either interlocutory or final, we need not address appellants' arguments regarding retroactivity.

## 2. Breach of Contract

Herb Gordon further contends that Chrysler's establishment of a Dodge dealer in Clarksville constitutes a breach of the Dealer Agreement.[12] If such is the case, and assuming that Herb Gordon adequately demonstrated that the inadequacy of money damages ultimately will entitle it to specific performance, an interlocutory injunction arguably was necessary to preserve the status quo. A review of the Dealer Agreement, however, reveals that Herb Gordon's Sales Locality is a nonexclusive territory. The Agreement does not provide for notification of existing dealers in the event a new dealer is established, and provides no criteria that Chrysler must apply in deciding where and when to establish additional dealers. Perhaps more important, Clarksville is not even located within Herb Gordon's Sales Locality as it is defined in the Dealer Agreement.

---

12. Although we note that the Dealer Agreement provides that it shall be construed in accordance with Michigan law, the parties do not make an issue of that fact and do not cite to any Michigan law that they deem to be controlling.

As Herb Gordon notes, the arbitration clause of the Agreement provides for a stay pending arbitration "[i]f the arbitration provision is invoked when the dispute between the parties is either the legality of terminating this Agreement or of adding a new CMC [Chrysler Motor Corporation] dealer of the same line-make or relocating an existing CMC dealer of the same line-make." This portion of the arbitration clause, however, does not purport to confer any rights upon existing dealers other than the right to have Chrysler's actions stayed pending arbitration if the dispute between the parties involves a particular subject matter. This portion of the arbitration clause is not linked to any affirmative provision in the Agreement regarding relocation or establishment of new dealers.[13]

Herb Gordon urges us to follow the holding of the Second Circuit in *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430 (2nd Cir.1993), a case that it insists is directly on point. As we shall explain, *Nemer Jeep–Eagle* is inapposite.

*Nemer Jeep–Eagle* involved an arbitration clause, similar to the one before us, that provided that the manufacturer would stay implementation of its decisions regarding termination or establishment of a new dealer pending arbitration of the dispute. The agreement in *Nemer Jeep–Eagle* similarly involved a nonexclusive sales territory. When the manufacturer granted a number of new franchises within 20 miles of appellant's dealership, appellant filed an action in federal court to compel arbitration and for an injunction preventing the manufacturer from implementing the new franchises pending arbitration. The manufacturer conceded its duty to arbitrate but contested appellant's right to obtain a status quo injunction. The trial court, applying the standards for granting preliminary injunctions, denied injunctive relief based, in part, on a determination that the appellant had failed to show that it was likely to succeed on the merits. On appeal, the Second Circuit

---

**13.** One explanation for inclusion of this language is that the Dealer Agreement may be a form contract used by Chrysler in multiple jurisdictions. Given that RMA legislation exists in more than 30 states, such a clause likely was written to address the requirements of such legislation.

expressly declined to reach the merits of the underlying dispute. Instead, it applied principles of specific performance and held that, under the express terms of the agreement, the dealer was entitled to a stay pending arbitration. Herb Gordon has no similar right to a stay under the terms of its agreement, because the right to a stay under the Dealer Agreement is expressly conditioned upon submission to arbitration of the underlying dispute.

Given that Herb Gordon failed to demonstrate the existence of the factors necessary to support the grant of an interlocutory injunction, it was error for the trial court to grant the injunction and we shall vacate the trial court's order. Thus, we need not determine whether the trial court's refusal to condition the injunction upon a bond was proper.

JUDGMENT VACATED; APPELLEE TO PAY COSTS.